**UNITED STATES v. GENERAL INSTRUMENT CORPORATION et al.**

Civ. A. No. 8586.

United States District Court
D. New Jersey.

Oct. 28, 1949.

Marcus A. Hollabaugh, Washington, D. C., C. Brooke Armat, Washington, D. C., George L. Derr, Cleveland, Ohio, Special Attorneys, Department of Justice, Alfred E. Modarelli, United States Attorney, Newark, N. J., attorneys for plaintiff.

Milton, McNulty & Augelli, by John A. Milton, Jersey City, N. J., attorneys for General Instrument Corporation, Abraham Blumenkrantz, Samuel Cohen and Condenser Development Corporation.

Elmer G. Van Name, Camden, N. J., attorney for Radio Condenser Co., Stanley S. Cramer and Russell E. Cramer.

Charles Handler, Newark, N. J., attorney for Variable Condenser Corporation, Charles H. Hyman, Edward Hyman and Nathan Hyman.

FORMAN, Judge.

This is a proceeding instituted under Section 4[1] of the Sherman Anti-Trust Act to prevent and restrain continuing violations of Sections 1[2] and 2[3] of that Act.

---

1. "The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1–7 and 15 of this title; * * *." 15 U.S.C.A. § 4.

2. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal: * * *." 15 U.S.C.A. § 1.

3. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, * * *." 15 U.S.C.A. § 2.

Each of the following named defendant corporations is organized under the laws of the state specified and has its principal place of business as shown below:

| Name of Corporation | State of Incorporation | Location of Principal Office |
|---|---|---|
| General Instrument Corporation [4] (hereinafter referred to as General) | New Jersey | Elizabeth, N. J. |
| Radio Condenser Company [4] (hereinafter referred to as Radio) | New Jersey | Camden, N. J. |
| Condenser Development Corporation [4] (hereinafter referred to as Development) | New Jersey | Newark, N. J. |
| Variable Condenser Corporation (hereinafter referred to as Variable) | New York | Brooklyn, N. Y. |

Each of the individual defendants whose name and address is set forth hereunder is associated with or employed by one or more of the corporate defendants and holds the official title or position as shown below:

| Name | Address | Title or Position | Corporation With Which Associated |
|---|---|---|---|
| Abraham Blumenkrantz or Abe Bloom | Elizabeth, New Jersey | President, Treasurer and Director | General |
| | | Secretary, Treasurer and Director | Development |
| Samuel Cohen | Elizabeth, New Jersey | Chairman, Board of Directors | General |
| | | Director | Development |
| Stanley S. Cramer | Camden, New Jersey | President and Director | Radio |
| | | President and Director | Development |
| Russell E. Cramer | Camden, | Vice President and Director | Radio |
| | | Director | Development |
| Charles H. Hyman | Brooklyn, New York, | President and Director | Variable |
| Nathan Hyman | Brooklyn, New York | Vice President and Director | Variable |
| Edward Hyman | Brooklyn, | Secretary and Treasurer | Variable |

The subject matter of this action concerns tuning devices used in radio receiving sets to select the incoming signals of a particular radio station. Tuning devices consist of both variable condensers and permeability tuners. In 1946 approximately

4. These defendants are also referred to as the "Development parties".

85% of all home radio sets manufactured and sold in the United States contained variable condensers.

## The Pleadings

The plaintiff alleged that in 1934, Radio, General and De Jur Amsco (hereinafter referred to as Amsco) together manufactured more than 75% of all variable condensers made in the United States; that the remaining manufacturers in 1934 were Federal Instrument Company (hereinafter referred to as Federal), Reliance Die and Stamping Company (hereinafter referred to as Reliance), and American Steel Package Company (hereinafter referred to as American); that defendant Variable commenced manufacture of condensers in 1938; [sic] that defendant Development was organized in 1934 as a patent holding corporation by Radio, General and Amsco; that from March 1940 to March 1946 General, Radio (including its affiliates Western Condenser Company and Manufacturers Supply Company), Variable, Oak Manufacturing Company, and American were the sole manufacturers of condensers, and that all the above except American were patent licensees of Development; that from 1934 to the date of the suit 60% of all variable condensers for home radios were manufactured by General and Radio, and since 1938, 3% of all variable condensers were manufactured by Variable; that about March 1946 several additional concerns commenced the manufacture of variable condensers with a total combined production not exceeding 5% of the condensers produced in the United States; that although since 1934 variable condensers have not been patented devices, some of the defendants held patents covering specified parts of variable condensers or methods of manufacturing or assembling parts of variable condensers; and that prior to July 30, 1934, Radio, General and Amsco had been active competitors and had been involved in patent infringement suits.

The alleged conspiracy to evade the Sherman Act is claimed to have commenced in or about 1934 when the three above mentioned competitors resolved their differences by forming Development; that on August 7, 1934, Radio, General and Amsco agreed for a period of five years with the right to extend the agreement for an additional period of years:

"(a) To assign to Development all of their present and future patents and patent rights relating to variable condensers and other tuning devices;

"(b) To give Development the option to purchase from others all present and future patents and patent rights relating to variable condensers and other tuning devices;

"(c) To cause Development to sue for alleged infringement of the pooled patents and to defend suits for infringement brought against any one of the parties to the agreement;

"(d) To cause Development to refuse licenses to others under any of the pooled patents unless it should obtain the unanimous approval of the stockholders of Development; and

"(e) To admit the validity of all patents held or subsequently acquired by Development, and not to contest the validity of such patents."

On the same date Development is alleged to have granted Radio, General and Amsco royalty-free, non-exclusive licenses under the assigned patents for the life of the patents.

Immediately following the formation of Development, it is alleged to have notified Federal and Reliance that they were infringing the pooled patents of Development; that in settlement of the subsequent patent infringement suit against Federal, Development granted to it on April 15, 1935, a license under the pooled patents at an unreasonably high royalty rate; that Reliance was issued a license by Development for the pooled patents in settlement of a patent infringement suit on May 19, 1937; that Federal, becoming insolvent on January 4, 1938, Development cancelled the license and that Rae Manufacturing Company (hereinafter referred to as Rae) was refused a license after having purchased the variable condenser business of Federal; that at the time of issuance of the license to Reliance, it, along with Radio, General and Amsco agreed to price

schedules set by Development; that soon after Variable entered the condenser field it was sued by Development for patent infringement; that Development purchased Wilhelm condenser patents in order to prevent their purchase by Variable; that Variable on February 4, 1938, was granted a license by Development providing that it observe Development's price schedules and not contest validity of Development's patents; that to eliminate competition in variable condensers General and Radio on or about May 28, 1939 jointly paid Amsco $50,000 for the patents and patent rights owned by Amsco, which, in turn, agreed not to manufacture or sell tuning devices in the United States and Canada for a period of ten years thereafter and that Amsco further agreed to discontinue use of its tools, dies, jigs and fixtures and not to sell them except for export to a foreign country other than Canada; that Radio, General and Development, on June 9, 1939, entered into two agreements to give General and Radio power to grant non-exclusive licenses to others under any of their respective licenses assigned to Development, and Development reassigned certain pooled patents to Radio and that in other respects, the agreement of August 7, 1934 was extended an additional five years; that since the 1939 agreement, General and Radio have refused licenses under the patents, referring all applicants to Development; that Development filed patent infringement suits against American in 1938 and Radio and General conducted a price war for the purpose of forcing American into a price fixing scheme and to limit its competition, and that the price war was continued until 1941 although the Second Circuit Court of Appeals held in December 1939 that the patent in issue was invalid (Condenser Development Corp., v. Davega-City Radio, 108 F.2d 174); that the price fixing provisions of the 1934 agreement, modified and extended in 1939, were terminated by Radio, General and Development on April 27, 1940, but until the date of the present suit General and Radio have continued consultations and agreements as to price fixing, types of tuning devices to be produced, and the allocation of customers; that an agreement on

March 1, 1946 between Radio and General modified the 1939 agreement, changing the form but not the substance of the previous agreements relating to variable condenser patents, continued the life of Development to March 1, 1951 and assigned to it nearly all of the tuning device patents held by General and Radio; that Amsco, Kings Electronics Company, National Electric Machine Shops, Robert L. Kahn, Lear, Inc., and other persons between August 1945 and March 1946 applied to General and Radio for licenses, who refused, referring applicants to Development and that Amsco's application was expressly refused; that certain of the other applicants were offered licenses under circumstances that would have placed the licensees at a serious economic disadvantage in competition with the Development parties and that Development refused licenses upon specific patents insisting that licensees take a license covering all pooled patents.

The plaintiff alleged that the defendants to further prevent competition threatened Baldwin Instrument Company in November 1945 with litigation when it planned to manufacture variable condensers and caused a suit for unfair competition to be filed against Kings Electronics Company in February 1946 by Variable; and that the defendants in May 1946, acting through defendant Charles H. Hyman, attempted to purchase equipment suitable for manufacture of variable condensers from Mechanical and Electronic Design Company who desired to enter the variable condenser business, and threatened to drive it out of business.

The plaintiff further alleged that all of these acts constitute engagement in an illegal combination and conspiracy and restrain and monopolize trade and commerce and that the said combination and conspiracy have consisted of and now consist of a continuing agreement and concert of action among the defendants, the substantial terms of which have been as follows:

"(a) That the defendants exclude others from the manufacture and sale of variable condensers by:

"(1) Inducing others to refrain from producing variable condensers;

"(2) Acquiring tools and equipment theretofore used in the manufacture of variable condensers for the purpose of preventing their acquisition and use by others for the manufacture of variable condensers;

"(3) Refusing to fabricate tools for the use of others for the manufacture of variable condensers;

"(4) Acquiring patents and patent rights from others;

"(5) Pooling patents relating to variable condensers;

"(6) Bringing and maintaining suits for infringement of the pooled patents; and

"(7) Refusing to grant patent licenses under the pooled patents.

"(b) That the defendants eliminate and suppress competition among themselves and with others in the manufacture and sale of variable condensers by:

"(1) Agreeing upon prices, terms and conditions of sale for variable condensers sold by the corporate defendants and others;

"(2) Adhering to the prices, terms and conditions of sale for variable condensers agreed upon as aforesaid;

"(3) Limiting types of variable condensers sold by each of the corporate defendants and others;

"(4) Allocating among the corporate defendants and other customers for sales of variable condensers;

"(5) Conducting price wars against other manufacturers of variable condensers; and

"(6) Refusing to grant patent licenses under the pooled patents save at unreasonable high rates of royalty and upon other terms and conditions."

The plaintiff prayed that the acts, agreements and practices of the defendants be adjudicated to be in restraint of trade and attempts at monopolization in violations of sections 1 and 2 of the Sherman Act; that such allegedly unlawful agreements be dissolved and the defendants perpetually enjoined from executing similar agreements; that Development have its affairs wound up and its corporate existence dissolved; and for other injunctive relief against the defendants to preclude the unlawful use of their patents or other practices in violation of the Sherman Act.

General, Radio and Variable together with individual defendants respectively by way of separate answers generally denied the plaintiff's charges and set up affirmative separate defenses. The first and second separate defenses of General and Radio alleged running of the statute of limitations and laches. As a third separate defense, Radio claimed that in the emergency of war, civil authority yielded to military authority and the Sherman Act was nullified. Both groups have expressly abandoned the claim that the action is barred by the statute of limitations. In the separate defenses interposed by the Variable group the right to make a motion to dismiss was reserved and pleas were entered that the action is barred by the statute of limitations, and that the court lacks jurisdiction over the group since the corporate and individual defendants reside in New York.

■ The objection made by the Variable group as to the jurisdiction of the court over them may be disposed of at once as being without merit. Since Radio and General are found to be within the District of New Jersey, it was proper to bring in a non-resident defendant pursuant to Section 5 of the Sherman Act, 15 U.S.C.A. § 5.[5] Standard Oil Co. of New Jersey v. U. S., 221 U.S. 1, 46, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734. This separate defense will therefore be stricken.

■ The separate defense of Radio that in the emergency of war, the war power of the Federal Government and military au-

5. "Whenever it shall appear to the court before which any proceeding under section 4 of this title may be pending, that the ends of justice require that other parties should be brought before the court, the court may cause them to be summoned, whether they reside in the district in which the court is held or not; and subpoenas to that end may be served in any district by the marshal thereof."

thorities take precedence over the civil law and nullified the Sherman Act during the emergency period is likewise without merit. It offered no proof of compliance with 50 U.S.C.A.Appendix, § 1112[6] whereby immunity was granted from the Sherman Act when the doing or omission of an act was determined to be "requisite to the prosecution of the war". This act demonstrated that special legislation was required to provide immunity from Sherman Act prosecutions.

■ All defendants claim that laches bars relief to the plaintiff arguing that the action was not filed until July 17, 1946 although in December 1944 the plaintiff had "knowledge of such information as would put a reasonable person upon inquiry, if pursued, would have led to knowledge of the matters and things about which plaintiff now complains * * *." To develop the facts necessary to initiate an action of the scope here involved required a tremendous investigatory task. The plaintiff was not placed on notice leading to a reasonable belief of suppression of competition in violation of the Sherman Act in the production of variable condensers until some time during the war emergency a bottleneck developed in variable condenser production.

Its proofs included many documents, designed to show the situation of the defendants, the setting in which the alleged conspiracy was established, the state of the industry within which the alleged conspiracy operated, and those preliminary and collateral matters necessary to present the alleged conspiracy in its context of operating facts. This necessitated minute and detailed study to develop the facts. Furthermore, since the United States is asserting rights as a sovereign to enforce a public policy, this defense, as a matter of law, is inapplicable, for the United States is not the nominal but real plaintiff. United States v. Beebe, 127 U.S. 338, 344, 8 S.Ct. 1083, 32 L.Ed. 121; United States v. Insley, 130 U.S. 263, 266, 9 S.Ct. 485, 32 L.Ed. 968.

Both the plaintiff and the defendants have presented a motion for summary judgment on the ground of the absence of any genuine dispute as to material facts. Both rely upon admission of fact, exhibits and affidavits. The defendants have admitted the authenticity of all of the plaintiff's exhibits, primarily consisting of contracts, correspondence between individual defendants, and their agents, interoffice memoranda, and minutes of meetings of De-

---

6. "Whenever the Chairman of the War Production Board shall, after consultation with the Attorney General, find, and so certify to the Attorney General in writing, that the doing of any act or thing, or the omission to do any act or thing, by one or more persons during the period that this section is in effect, in compliance with any request or approval made by the Chairman in writing, is requisite to the prosecution of the war, such act, thing or omission shall be deemed in the public interest and no prosecution or civil action shall be commenced with reference thereto under the antitrust laws of the United States or the Federal Trade Commission Act. Such finding and certificate may in his discretion be withdrawn at any time by the Chairman by giving notice of such withdrawal to the Attorney General, whereupon the provisions of this section shall not apply to any subsequent act or omission by reason of such finding or certificate.

"The Attorney General from time to time, but not less frequently than once every one hundred and twenty days, shall transmit to the Congress a report of operations under this section. Reports provided for under this section shall be transmitted to the Secretary of the Senate or the Clerk of the House of Representatives, as the case may be, if the Senate or the House of Representatives, as the case may be, is not in session.

"The Attorney General shall order published in the Federal Register every such certificate and, when he deems it in the public interest, the details of any plan, program or other arrangement promulgated under, or which is the basis of, any such certificate.

"This section shall remain in force until six months after the termination of the present war or until such earlier time as the Congress by concurrent resolution or the President may designate, but no prosecution or civil action shall be commenced thereafter with reference to any act or omission occurring prior thereto if such prosecution or civil action would be barred by this section if it remained in force."

velopment, with the exception of plaintiff's exhibit 10 in response to plaintiff's requests for admissions and stipulations. For the purpose of this motion, Exhibit 10, is not considered nor does the plaintiff rely upon it.

Since these are motions for summary judgment, it is not for the court to resolve disputed questions which appear in issue but to determine whether a question of fact is present. Frederick Hart & Co. v. Recordgraph Corp., 3 Cir., 169 F.2d 580. In the absence of triable issues of fact, no reason exists for not granting a motion for summary judgment in anti-trust actions. Cf. International Salt Co. v. U. S., 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013. The facts determined, a court is not precluded from adjudicating the legal consequences to be drawn from undisputed facts. Fox v. Johnson & Wimsatt, 75 U.S.App.D.C. 211, 127 F.2d 729, 737; Fletcher v. Krise, 73 App.D.C. 266, 120 F.2d 809.

### The Arguments

The plaintiff contended that the agreements by which General and Radio concentrated patents in Development eliminated competition and are inherently illegal for the following reasons:

(1) The parties obligated themselves to pool present and future patents and to act jointly in prosecuting and defending patent infringement suits;

(2) the parties to the pool relinquished their individual rights to license others and acted jointly in approving or disapproving the applications for licenses under the pooled patents;

(3) the parties agreed not to compete in acquiring patents and patent rights from outsiders;

(4) the blanket admission of the validity of present and future patents is illegal since the requirement exceeds what is necessary to settle a patent controversy;

(5) the price fixing agreement was an act of the pool and its licensees, neither justified nor validated by holdings of the United States Supreme Court.

The defendants contended that the patent pool and cross-license arrangements under which they operated from August 1934 to the date of suit were legal in fact and in law; that the agreements did not have the effect of "excluding others from the manufacture and sale of variable condensers" but on the contrary had the actual effect of licensing and permitting not only each of the patent owners in the pool but all other "condenser manufacturers as well, to manufacture and sell the best condensers invented and designed by the patent owners who were the largest manufacturers in the field, and this with the elimination of all past patent conflict and the expected elimination of all future patent conflict." They insisted that their patent pool was within the normal confines of the patent law and that the United States Supreme Court had upheld as valid "pooling" as they operated it.

The plaintiff argued that the defendants had refused to license Rae, Amsco (following the 1939 agreement), Kings Electronic Company, National Electric Machine Shops, Robert L. Kahn, and Lear Incorporated, and that Development had issued no license since 1944 except to Oak Manufacturing Company, and that when licenses were offered they were to cover all of its patents at rates which, if accepted, would have placed the applicants at a serious economic disadvantage.

Defendants admitted the applications for licenses as enumerated but claimed that licenses on reasonable terms were offered to all. They claimed that from 1939 to 1944, only one application for a license was made, and this by Winters & Crampton Corporation in the latter part of 1944, who later decided not to enter the business. Defendants further claim that no other applications were made until the termination of World War II and that then applications were received from December 1945 to February 1946 from Kings Electronic Company, National Electric Machine Shops, Robert L. Kahn and Lear Incorporated. The refusal to License Rae was conceded but it was alleged to be based upon poor economic conditions in 1938. Defendants deny that Amsco seriously en-

deavored to resume the manufacture of variable condensers during World War II and claim that their rejection of its request for a release from its agreement in October 1945 was not ultimate or final for it was accompanied by the following statement: "If you see any reason for our reaching a different conclusion we will be pleased to further hear from you", to which Amsco made no reply.

The plaintiffs in support of the charge that the defendants excluded others from entering or exploiting the variable condenser field by bringing and maintaining suits for infringement of pooled patents argued that licenses to Reliance, Variable and Federal were adjunctive to infringement prosecutions and asserted that certain Wilhelm patents were acquired to prevent their acquisition by Variable which needed them in defending a patent infringement suit instituted by Development and which intended to avoid Development's patents by manufacturing under them. The defendants submitted that Development was within its rights in instituting suits and that the last infringement suit was disposed of in 1939 which they urged refuted the charge that they impinged the anti-trust laws by bringing and maintaining oppressive suits for infringement. They argued that there were 739 patents in the variable condenser field and that from August 1934 to date they purchased but two patents from others, the Wilhelm patents, known at the time to have no material value, for which $500 was paid. They insisted that those patents were purchased in January of 1938 and constituted an isolated act, which, even if it were in violation of the Sherman Act, would be barred by the statute of limitations and that in any event their right to purchase patents is undeniable.

To the plaintiff's charge that they eliminated and suppressed competition among themselves and others, the defendants claimed that members of the alleged pool have always competed among themselves. With respect to the suppression of others, defendants pointed to licenses granted Federal, Variable, Manufacturers Supply, Reliance and its successor Oak Manufacturing Company and that a similar li-

cense was offered at all times to American and all others with the exception, in 1938, of Rae.

In answer to the plaintiff's charge that they agreed upon and adhered to price schedules in common, the defendants asserted that Development's authority to fix prices never extended beyond the three patents to which Radio held a reversionary interest (Cramer Patents 1,800,719 and 1,757,357 and Swope Patent 1,620,244) and that by a reassignment of these patents to Radio on June 9, 1939, the owner and not Development became the licensor. The plaintiff countered with the assertion that the modifications attempted by the assignment of June 9, 1939 were only nominal and were never actually utilized. Defendants insisted that price fixing was eliminated in 1940 following the declaration of the invalidity of Cramer Patent 1,800,719.

The plaintiff claimed that by an agreement of May 1937 certain of the defendants allocated customers among themselves and agreed that none of them would solicit the customers then being supplied by the other nor would the defendants reduce their respective prices by bidding in competition with each other. However, upon demand, the plaintiff did not specify the names of the parties among whom customers were allocated, who did the allocating, when, and of what the allocations consisted. Defendants denied the alleged agreement and argued that an arrangement of this sort would conflict with the interest of their respective commission salesmen. They submitted that it is the practice of customers to spread their orders among manufacturers in order to avoid the consequence of work stoppages.

The plaintiff claimed that the defendants engaged in a price war with American Steel Package Company with intent to drive the alleged sole remaining independent manufacturer out of the variable condenser field. The defendants denied that a price war was conducted against American and submitted that there was a general lowering of prices in 1938 because of a depression in the radio industry.

The plaintiff contended that none of the defendants during the period January 25, 1938 until August 24, 1938 offered a new model of variable condensers for sale at a selling price below the price then charged for a common Model 20 condenser and during the period July 13, 1939 until the date of the filing of this suit no new models were offered for sale by General, Radio or Variable because of a specific agreement between the parties. Defendants asserted that every party to the alleged pool had a right to bring out new models without prior consultation, that within the 1939 period specified two new models were offered to the trade, and that 17 new models were offered in the second period beginning July 1939.

The plaintiff claimed an agreement of April 1939 between General and Radio, on the one hand, and Amsco on the other, whereby Amsco, among other things, agreed to withdraw from the variable condenser business and was paid $50,000, was a non-ancillary agreement in restraint of trade and violative of the antitrust laws. The defendants insisted that it was upon Amsco's initiative that they entered into the agreement to purchase its variable condenser business of which Amsco for a number of years had expressed the desire to rid itself. They denied the agreement was to lessen competition and insisted that the covenant by Amsco not to engage in the condenser business for ten years was a reasonable protection to the defendants and ancillary to their agreement to purchase.

The plaintiff contended specifically that the defendant Variable was part of the general conspiracy to violate the antitrust laws with knowledge of its illegality and must be held liable for its own and the acts and statements of its co-conspirators. Variable argued that it was nothing more than a reluctant licensee acting to protect its business from patent litigation; that it did not participate in any other agreements or arrangements; that it did not maintain prices; or even pay the royalties demanded of it and compromised the claim for royalties only after bitter litigation; and that it had no knowledge of the basic agreements between the other defendants having neither the right nor the opportunity to participate in their meetings.

## The Facts.

From the undisputed documents and evidence offered by the plaintiff and such admissible evidence as may be gleaned from the defendants' proofs before the court on these motions, the facts in this case appear to be as follows.

Prior to 1934, the principal manufacturers of variable condensers within the United States were Radio, General, Amsco, Reliance and American, and all were engaged in interstate trade and commerce. General and Radio were the two largest manufacturers, controlling between themselves a percentage in excess of 50 percent of the total production within the United States.[7] All of the aforesaid manufacturers were in active competition and patent litigation had been conducted between them. Early in 1934, Mr. Maxwell James, general counsel and a director of General, proposed to Amsco and Radio a comprehensive scheme whereby their continuous and expensive patent litigation could be adjusted. These negotiations culminated in an agreement signed on July 30, 1934 whereby a patent holding corporation, Development, was formally organized, with the parties to the agreement being General, Radio and Amsco.

On August 7, 1934 an agreement was signed by General, Radio and Amsco, "the first contracting parties", and Development, "the second contracting party", whereby provisions were established for the assignment to Development of all

7. Plaintiff and the Development parties vary in estimating the percentage of total variable condensers manufactured by defendants. An affidavit relied upon by the defendants establishes the figure at 60 to 65%. This same affidavit places the total at 75 to 80% when that of Amsco is added. However, the percentage admitted by them establishes the fact that a substantial portion of the industry, well over 50%, was within their control.

present and future patents and patent rights relating to variable condensers and for Development to grant licenses to the "first contracting parties" at reasonable rates of royalty. Because of a differential value in the patents owned by Radio and assigned to Development, it was paid the sum of $7,500 by General and Amsco in further consideration of the assignment. Development was given the option to purchase all present and future patent rights from outsiders. It was further provided that: "The contracting parties further mutually covenant and agree that the said second contracting party shall have the power to grant non-exclusive licenses to other persons, firms or corporations unanimously designated by the first contracting parties to receive such licenses. * * *" Infringement suits brought against any of the contracting parties were to be defended by Development provided all of them were manufacturing and selling types similar to the claimed infringing condenser with the costs and expenses of the litigation to be paid by Development from a working fund. Development was further empowered to initiate infringement suits under the pooled patents upon request of two or more of the contracting parties provided that if the suit was against customers, the party who had the bulk of the customer's business had to be one of the consenting parties. Where an outsider sued an individual member, that member was given the right to use any of the pooled patents originally owned and controlled by it in the litigation and Development was required to reconvey these patents for that purpose. The costs and expenses of such suits were to be paid out of a working fund held by Development which was provided for by assessing equal shares from the first contracting parties and any money derived from the suits as well as royalties were to go into this fund. When the working fund exceeded $9,000, the surplus was to be distributed among the first contracting parties. There was a further provision that: "Each of the parties hereby admits the validity of all the Letters Patents in Schedules A. B. and C. hereof and agrees to admit the validity of all the Letters Patents which may hereafter be acquired from whatever source by the second contracting party, and each of the parties agrees not to contest or aid in contesting, directly or indirectly, the validity of any of such Letters Patents." Attached to the contract were the lists of patents designated Schedules A, B and C, respectively owned by the first contracting parties. The parties eventually assigned all their respective patents relating to variable condensers to Development, creating a pool of 47 patents in the amounts originating as follows: Radio, 24 patents; General, 12 patents; and Amsco, 11 patents.

On August 17, 1934, prior to the issuance of licenses by Development to the remaining contracting parties, Development sent notices to American, Reliance and Federal (a newcomer in the industry), advising of alleged infringement of certain of the pooled patents. Development commenced suit on November 5, 1934 against Federal on two pooled patents, Cramer No. 1,800,719 (ball-bearing), subsequently declared invalid in an action against a distributor of American, Condenser Development Corp. v. Davega-City Radio, Inc., 2 Cir., 108 F.2d 174, and Cramer No. 1,757,357 (insulating strip). Federal accepted a license from Development on April 15, 1935 whereupon a consent decree was entered April 23, 1935 disposing of this litigation.

Development brought an infringement suit on November 3, 1934 in the Eastern District of New York, on Cramer patent No. 1,800,719 and Tompkins patent No. 1,932,328 against Montgomery Ward, a distributor of Reliance, although earlier Reliance, in a notice from Development, was charged with having infringed these patents in addition to Hardy patent No. 1,609,118. A patent infringement suit was filed by Development against Walgreen & Co., another distributor of Reliance, on February 24, 1936 in the Southern District of New York but this suit was discontinued in favor of prosecuting the former suit. Reliance vigorously defended Montgomery Ward. The trial court declared the Tompkins patent invalid and the Cramer patent

valid and infringed. Condenser Development Corp. v. Montgomery Ward & Co., D.C., 20 F.Supp. 600. Reliance appealed and filed briefs and reply briefs when counsel for Development opened negotiations for settlement. Reliance withdrew its appeal and took a license with price fixing provisions under the pooled patents on May 19, 1937.

In this license agreement between Development, called the licensor, General, Radio and Amsco, called the manufacturing parties of the licensor, and Reliance, called the licensee, Development granted a non-exclusive license to Reliance under all of the patents held by Development with provisions for royalties and a price schedule. Under the price schedule, customers were divided into three classes, A, B, and C, with different prices for each class. Prices and charges for calibration, labor, parts, tools and extras were fixed. A penalty for violating the fixed prices, not to exceed ten percent of the total sales price of the condensers involved, was to be distributed to the other parties and licensees in proportion to their respective gross business in condensers for the current year. In addition to the price provisions, Radio, General, Amsco and Reliance agreed to put up their proportionate shares of $3,000 for expenses and thereafter to pay their proportionate monthly shares of expenses based upon their respective gross business in condensers, the sum of which was not to exceed $25,000 per annum unless otherwise consented to. Development was to have charge of the funds.

An Administrator was provided for the industry by this agreement with specific duties and authority set forth. All parties to the agreement were to abide by the decisions of the Administrator. Radio, General, Amsco and Reliance were to forward to the Administrator the specifications of standard condensers (those included in the price schedules) and the proposed price and terms twenty-four hours before quoting a price to a prospective customer. The Administrator was to check the specification, prices and terms and notify the party or licensee of any violation. Similar information on orders for new condensers (con-

densers not included in present or future price schedules) plus the tooling costs involved were to be sent to the Administrator. The prices and terms on new condensers, however, were to be not less than the prices and terms on any similar standard condenser. The Administrator was given authority to make periodic visits to plants and offices of all of the parties and licensees to investigate and verify all matters pertaining to his duties.

Contemporaneously, there was executed in addition to the contract with Reliance, a supplemental contract between General, Radio and Amsco, as one party, and Development, as the other party, wherein the 1934 agreement was extended to August 7, 1944. Paragraph 2 of this agreement stated: "The parties hereto mutually agree that any one of the first contracting parties hereto [General, etc.], at any time after six (6) months beginning with the day the administrator (provided for in said agreement dated the 19th day of May, 1937) has been appointed and has been set up and is ready to carry out the duties of his office, upon reaching the conclusion that the Price Schedule Provisions and the administration thereof provided for in said agreement of the 19th day of May, 1937, are practically unworkable, may empower the second contracting party, Condenser Development Corporation, to cast in fifteen (15) days after notice given, a unanimous vote to terminate or cancel the Price Schedule Provisions of said agreement and the administration thereof pursuant to Paragraph Fifteenth of said agreement; and the Condenser Development Corporation shall thereupon cast said unanimous vote and notify all the parties thereof pursuant to said Paragraph Fifteenth of said agreement." The fifteenth paragraph of the license agreement to Reliance contained a provision wherein Development was authorized to specify the types of condensers, prices and terms for sale with notice of intention to effect changes to be given by the Administrator simultaneously to all parties by telegraph and further provisions for effecting the changes and future cancellation.

By a contract dated July 1, 1937, Mr. Edward Metzger was employed as Administrator and held this position until March 21, 1940 when it was terminated. Mr. Metzger attended most of the major meetings of Development, actively participated in them, was frequently consulted on policy matters, and had access to considerable confidential information. As Administrator, he served as the coordinating element for all the parties permitting Development to be attuned to competitive conditions in the industry. When a later agreement by which Amsco terminated the manufacture of condensers was effected, he was charged with the supervision of its provisions concerning the inventory and storage of tools involved in that agreement.

Development had been notified in 1937 that Variable, a newcomer to the variable condenser industry, was infringing patents assigned to it. It filed suit on November 9, 1937 against Union Parts Manufacturing Co., a distributor of Variable, alleging that Cramer patent No. 1,800,719 was infringed. Variable had discovered two patents, Wilhelm patent No. 1,602,803 and Wilhelm patent No. 1,717,429, which it believed would permit it to manufacture condensers without infringement of the Cramer patent. Mr. Charles Hyman of Variable notified Mr. Stanley S. Cramer, President of Development, that he had located these patents and that he intended to use them in connection with the threatened patent litigation. Mr. Cramer forwarded this information to Messrs. James, Harry de Jur of Amsco and Abraham Blumenkrantz of General.

On December 8, 1937, Mr. James reported by letter to the Development parties and Mr. A. D. T. Libbey, attorney for Radio and Assistant Secretary of Development, that he had been in communication with Mr. Alexander Konoff, President of Metric Instrument Company, another client of Mr. James, and exclusive licensee of the Wilhelm patents. Mr. Konoff had advised Mr. James that Mr. Charles Hyman of Variable was negotiating for the purchase of the Wilhelm patents which Variable desired for use in the patent suit brought by Development and also to permit it to change the structure in its condensers so that they could come under the Wilhelm patents. Mr. James requested Mr. Konoff not to sell the patents until Development had an opportunity to investigate them and determine whether it desired to purchase them. In his letter Mr. James analyzed the patents, concluded that it was doubtful that Variable would adopt a construction of the character of the Wilhelm patents in any condensers in the future and stated that upon being further pressed by Mr. Konoff for a decision whether Development would purchase the patents, he gave him the substance of his opinion concerning them and informed him that: " * * * I could not see my way clear to advising my client to purchase these patents except possibly for the reason of preventing their being picked up by the Variable Condenser Corporation and provided only that the price set thereon was low."

Mr. James continued as follows: "I, therefore, asked Mr. Konoff to let me know what the offer on these condensers was so that I might pass the word along and be enabled to make my recommendations accordingly. He informed me that he was asking $1000.00 for the patents, that the first offer that was made thereon was $250.00 and that Mr. Hyman told him this morning that he may be able to get his board to agree to pay $500.00 for them, but that this would be the highest figure available." He again requested Mr. Konoff not to sell the patents until he had further opportunity to talk the matter over with the members of Development. On January 7, 1938, Mr. John H. Wilhelm, as owner, and Metric Instrument Corporation, as exclusive licensee, transferred their respective interests in the patents to Development for the sum of $500.

On January 4, 1938, Federal became insolvent and Mr. James, acting for Development, terminated its license. Its business was purchased by Rae, which on May 25, 1938 applied to Development for a license, but was refused.

Mr. James, by letter dated January 26, 1938, to the Development parties and Mr. Libby, reported a conversation with Mr. Arthur Schneider, counsel for Variable.

regarding a license. In this letter Mr. James set forth the fact that Development followed the policy of not granting two licenses in the same locality. He reported that Variable was experiencing serious financial difficulties and faced extensive patent litigation. The progress of the negotiations toward the licensing is further reported in detail by Mr. James in his letter of February 3, 1938, in which he said, among other things, the following:

"This is a brief report on a conference had yesterday at this office between Mr. Metzger and the writer and Mr. Schneider, attorney for Variable. Mr. Hymans was not present at this conference.

"There was obviously much preliminary work to be done to educate the new licensee to C. D. C.'s methods and to the seriousness of C. D. C.'s policy. Much of our time was consumed in this educational process and in that respect it was well spent. We objected to Mr. Hymans' absence and this fact is being conveyed by Mr. Schneider to Mr. Hymans. Mr. Schneider came alone because Mr. Hymans seems to have full confidence in Mr. Schneider and because there were apparently a number of legal matters that Mr. Schneider first wished to have considered.

"The next conference has been set for tomorrow, Friday, at 11 A.M., at which conference it is expected that both Mr. Hymans and Mr. Schneider will be present representing Variable and Mr. Metzger and the writer will be present representing C. D. C. Mr. Metzger is getting up the price schedule applicable to Variable and it is expected that this price schedule will be ready to be appended to the agreement tomorrow. We see no reason why the agreement should not be concluded in tomorrow's session.

"From all the discussion which took place on the legal aspects of the agreement, only a number of minor changes to the agreement has been arranged for. This will be discussed below.

"The main point at first made by Mr. Schneider was to convey Mr. Hymans' business decision that Variable did not wish to be bound by any minimum and that the royalty rate should be the flat one-half cent even in the event that the price provisions are terminated.

"Either of these proposals, I absolutely refused to entertain. I informed Mr. Schneider that I had received the approval to make the minimum figure of $1800. and to make the basic royalty one cent instead of one-and one-quarter cent. I explained why this was absolutely essential. This figure was arrived at as amounting to a 5% royalty. I pointed out that the members of C. D. C. in carrying on their research work and in spending money for their patents and litigation pay far more than the equivalent of this 5% royalty. With reference to the 'minimum', I pointed out that the stipulation in the agreement really did not mean a minimum as such, but was an option on the part of C. D. C. to cancel the agreement in the event that the minimum number of condensers were not made, but that such option could be cancelled by the payment of the minimum royalty. Schneider seemed to be satisfied with both explanations and later intimated that he was 'sold' on the fairness of the agreement and that he was representing Mr. Hymans' point of view.

"You will recall that we had similar discussions on these two subjects with Reliance and that Reliance also took the viewpoint that in the event of a breakdown of the price provisions of the agreement, the basic royalty should be less rather than more than the one-half cent figure.

\* \* \* \* \* \*

"Mr. Metzger at various parts of the conference impressed Mr. Schneider with the seriousness of C. D. C.'s maintenance of the price provisions, and Mr. Metzger insisted time and time again that unless Variable was prepared to adhere strictly to the high moral policy adopted and now being carried out by the members of C. D. C. and the other licensees, C. D. C. was not interested in granting any license. Mr. Schneider was informed that Mr. Hymans would be held to strict accountability in every way to following and upholding the rules of conduct laid down by the administrator. Mr. Metzger wisely discouraged the granting on our part of a license and

the taking on the part of Variable of a license if Mr. Hymans had any idea of using any method to render nugatory or vitiate the work of the administrator under this agreement.

"I assume that Mr. Metzger will repeat these 'lectures' for the benefit of Mr. Hymans at our next session.

\* \* \* \* \* \*

"Mr. Schneider in arguing for the right to cancel the agreement in the event that the three price provision patents of the agreement are held invalid and the price provisions are cancelled from the agreement. I have refused to agree to any such right of cancellation. I believe that Mr. Schneider will continue arguing this point tomorrow.

"I have anticipated, judging from Mr. Hymans' insistance [sic] at the last conference, that either Mr. Schneider or Mr. Hymans would take the position that they did not want any minimum guarantee in the agreement and that they did not want a basic royalty higher than the one-half cent figure in any event. I, therefore, gave my study to the recently issued patents to Cramer, Nos. 2,087,902 and 2,101,985, and at an early point of the conference, I informed Mr. Schneider that C. D. C. was determined not to permit Variable to gain a foothold in the business, and that I was authorized to file a supplemental bill of complaint based on alleged infringement of these two newly issued Cramer patents. I argued that the method claims 4 and 6 of the earlier patent (No. 2,087,902) was infringed, and that claims 1, 2 and 12 to 15 of the later patent (No. 2,101,985) were infringed. Mr. Schneider has not had time to digest these patents, but even if he did have time to do so, I think it would have made the impression I wished to convey.

"I believe the time has come when the recently issued patents to all three members of C. D. C. should be acquired by C. D. C. so that they may be embodied in Schedules 'A', 'B' and 'C'. I believe these patents, because of their recent issuance and because of possible infringement of some of them, should be added to the schedules to strengthen the present license agreement,

particularly in the event that the other patents are held invalid and the price provisions fall. I also believe these patents may be useful in helping to get American Steel Package Company into the fold. After Variable's agreement is signed, I will recommend my again approaching American Steel Package Company charging them with infringement of other patents and possibly with the Cramer patent No. 2,101,-985, in an endeavor to get American Steel Package to change its attitude, particularly in the light of the pending suit which it alone will have to maintain when the Variable litigation is settled."

Variable on February 4, 1938 took a license from Development which contained essentially identical provisions as those in the Reliance license.

Because of its financial difficulties, Variable applied to Development for better royalty rates, which application was denied and the Administrator was instructed to press Variable for overdue payments. On May 28, 1938, Variable requested relief from payment of royalties for the remainder of the year due to a price reduction recently announced by Development, high overhead and legal costs. It paid no royalties for approximately one and a half years. On January 18, 1940, Mr. Benjamin Isaacs, an assignee of Development, commenced a suit against Variable for royalties and damages. In an amended answer, filed April 4, 1944, Variable stated:

"A. That the plaintiff's assignor, the Condenser Development Corporation, was owned, operated and controlled and organized by the Radio Condenser Company, General Instrument Corporation, De Jur-Amsco Corporation and others, for the purpose of creating a monopoly in the variable condenser field and for the purpose of restricting and preventing free competition and for fixing prices in violation of the Sherman Anti-Trust Act and other laws. That in the furtherance of said conspiracy and scheme, the agreements sued on herein were made by said Condenser Development Corporation with the defendant.

\* \* \* \* \* \*

"C. That the agreement upon which the plaintiff brings this action was a device

to create a monopoly; and a price-fixing agreement in violation of law and that the same is, accordingly, null and void and inoperative."

However, Variable settled this suit on March 13, 1945 by payment of $1,000 and its admission that the license of January 4, 1938, as amended, was a good and valid one and it remained at the filing of this suit a licensee of Development.

In December of 1945, representatives of Kings Electronic Company approached Development seeking a license to manufacture a single model condenser. It advised Mr. James that it had been in communication with Variable in regard to the purchase of Variable's license from Development and its equipment. Mr. James on December 27, 1945 informed Mr. Schneider that Variable was not authorized to offer its equipment or license to Kings Electronics. Kings Electronics commenced to negotiate with Development for a license, never resulting in consummation, and was offered one which contained among other provisions a $5,000 yearly minimum royalty fee. On February 8, 1946 Variable brought a suit for unfair competition against Kings Electronics, but lost the case. Later Kings Electronics sought information from Development on whether, if it accepted a license, the initial royalty payment could be deferred because of its expenses in the Variable suit. In May of 1946, Mr. Charles Hyman of Variable visited the plant of the Mechanical and Electronic Design Company for purposes of purchasing jigs, dies, tools and other equipment thought to be of possible value in the manufacture of variable condensers but no sale was consummated. The suit against Kings Electronics and the visit to Mechanical and Electronics were not pursuant to any agreement between Variable and the Development parties as appears from the evidence relied upon by the plaintiff itself— the affidavit of Mr. Charles Hyman, president of Variable.

On April 28, 1939 Amsco entered into an agreement with General Instrument and Radio Condenser whereby its individual officers, directors and stockholders, agreed to withdraw from the variable condenser industry in the United States and Canada for a period of ten years for a consideration of $50,000 paid by General and Radio. It surrendered all of its rights in Development, including stock and reversionary interests in the patents assigned to the pool. Radio and General desired to purchase Amsco's tools used in the manufacture of condensers at this time but Amsco did not choose to sell them as it entertained ideas of transporting them to France where it had some interest and there setting them up in a manufacturing business. It was agreed that in order to secure Radio and General against the liberation of the tools in a market competitive to theirs that any tools owned by Amsco which could be employed in manufacturing variable condensers would be held in storage under the control of General and Radio with the further provision that the tools could not be sold in the United States and Canada. However, Amsco was granted the right to sell the tools for export to a foreign country other than Canada provided that in making the sale it would notify the purchaser that the equipment could not be sold or returned to anyone in the United States, its possessions, or Canada and that in the event of Amsco effecting such a sale, it would notify General and Radio. There was a separate agreement between Radio and General of June 10, 1939 which provided that in the event either party purchased the Amsco tools, the purchaser would not resell them in the United States or Canada.

The Amsco agreement did not provide for the sale of Amsco's good will or business but was expressly stated to be that "the parties of the second part are desirous of purchasing certain shares of stock of the Condenser Development Corporation, owned by the parties of the first part, and are desirous of securing by assignment certain patent rights owned by the parties of the first part, and are desirous of securing the surrender of all licenses now held by the parties of the first part from Condenser Development Corporation * * *." To secure Amsco's compliance with the agreement, there was provided as follows: "The parties of the second part, or either of them, shall have the right, at any time at their option, to remove to and to store the said

tools, dies, jigs, and fixtures in a bonded warehouse in the City of New York, in the name of the parties of the first part, at the equal expense of the parties of the second part, with a right on the part of the parties of the first part, to withdraw all or part under the limitations imposed by the party of the second part, under this agreement. The warehouse receipt shall be placed in escrow under proper receipt, with any bank, trust company in New York City, or with the said Edward Metzger, for the purpose of assuring the disposition of the tools, dies, jigs and fixtures, pursuant to this agreement. The warehouse receipt is to be turned over to the parties of the second part on demand for the purposes of this agreement. If however, the parties of the second part do not exercise said option to store said tools, dies, jigs and fixtures, then the parties of the second part shall have the right to inspect the said tools, dies, jigs and fixtures from time to time, at the business place of the parties of the first part, for the purpose of ascertaining whether the provisions of this agreement are being fully complied with, and in order to insure the performance of the terms and provisions of this agreement." For a period of time the tools of Amsco were held in storage under the supervision of the Administrator, Mr. Metzger.

In interpreting this agreement and explaining the consideration paid for its execution General, in a stock prospectus issued August 28, 1940, stated that "The Corporation has considered this acquisition as being primarily in the nature of a payment to the De Jur-Amsco Corporation for the discontinuance of the use of its tools and has accordingly charged on its books practically the entire sum to an intangible account 'Tools and Dies—(Special Rights)' which is being amortized over a period of three years."

Radio organized a new corporation, Manufacturer's Supply Company (Manufacturer) in August 1939 and purchased nearly all the Amsco tools for the sum of $27,000, which Manufacturer proceeded to utilize for a time in factory space rented from Amsco where it formerly manufactured condensers.

Following 1939 Amsco manufactured other products such as exposure meters for cameras. In October of 1945, an official of Amsco approached Mr. Russell Cramer in regard to relief from the ten year clause in the Amsco agreement of 1939. Mr. Cramer rejected this offer after discussing the matter with General. In a letter to Amsco dated October 23, 1945 he stated:

"Please be advised that upon giving this matter due and careful consideration, we fail to see any reason why you should be released from the aforesaid agreement or why the said agreement should be altered or terminated.

"If you see any reason for our making a different conclusion we will be pleased to further hear from you."

Early in 1934 Mr. Russell Cramer, acting for Development, sought to persuade Mr. Grover P. Behringer of American to accept a license from Development. It is in dispute whether this was on a royalty or non-royalty paying basis. American refused this offer although Mr. Cramer continued to discuss the matter until 1937 with Mr. Behringer. There was subsequently extensive correspondence concerning this subject which failed to produce tangible results and eventuated in Development filing a patent infringement action against Acme, a distributor of American, in the Eastern District of New York, and against Davega, another American distributor, in the Southern District of New York. Development claimed that American infringed four pooled patents, but suit was brought on Cramer Patent No. 1,800,719. American defended the Davega suit and the Cramer patent was held to be valid and infringed in the lower court. However, the Second Circuit Court of Appeals reversed in Condenser Development Corp. v. Davega-City Radio, Inc., 2 Cir., 108 F.2d 174. American never became a licensee of Development or any contracting party forming Development and has always continued to remain an active and open competitor.

According to the minutes of Development for January 7, 1938, Messrs. Price, Bloom, May, R. Cramer, Winzeler and Metzger held a discussion "regarding a small condenser comparable to Steel Package [Amer-

ican] Model S. After much consideration it was agreed that before any model lower in price than the Model 20 would be introduced by any manufacturing party he would consult with the group before introducing such models." The new model planned, known as Model 24, was to have the dimensions of Model 20 but incorporated certain internal changes and prices were to be published July 1, 1938. On February 15, 1938 a meeting was held in Chicago attended by Messrs. Samuel Cohen and H. Berman, representing General; Messrs. William May, sales manager, and Robert Beusman, Western Division sales manager, representing Radio; and Mr. Metzger, the administrator. Mr. Metzger wrote Mr. Russell Cramer of Radio, Mr. B. H. Price of Amsco, and Mr. A. Bloom of General in regard to the meeting that:

"The general sales picture may be anallyzed as follows:

"Model 20 or equivalent at the moment is the only condenser for which there is any call. The statement was made that not alone are they being used on the $10.00 radio jobs, but are also being used on larger jobs, a tendency which may make the Model 20 preponderate as a choice in designing receivers for 1938.

"Some effort was made to estimate Tin Can's production at this time, with a figure somewheres between 6,500 and 8,000 two gang jobs being produced daily by him.

"The question of price reduction was introduced on the Model 20. This topic, from the discussion which ensued, may be classified into three general groups :—

"1. No reduction advisable at this time.

"2. Reduction on base price.

"3. Reduction on extras only.

"Under Group #1, reasons given making it inadvisable to lower prices on the Model 20 may be set up as follows:

"A. Loss in revenue by reason of lower price.

"B. Psychological attitude on the trade when business is at its low ebb, and also possible harm in our basic position considering the firm stand shown the trade by C. D. C. members up to this time.

"C. What will be gained in lowering prices when Tin Can meets cut, with particular consideration to his more favorable position because of the general sympathy with him as against C. D. C. members.

"Under Group #2, the general feeling seemed to be to maintain the present base price, in view of competitor's base price, which is approximately the same.

"Under Group #3, some leaning towards cutting extras on the theory that our price disadvantage is created in the extras. The objectionable feature in cutting the price on the extras is in a general reduction of quotations on condensers in the larger classes. Some of the extras which the field men particularly object to are—packing charges and shaft extras, such as extensions, step-downs, keyways, coaxial holes, shafts with threaded ends, flats, etc.

"In the final analysis, any step along these lines serves notice to Tin Can of war, which may bring him into line, and on the other hand may merely make him fight harder. Guess which?

"Messrs. Beusman and Berman are going to get together and make recommendations on those price extras which definitely place them at a disadvantage in trying to sell their product, and this is being done for the purpose of reviewing costs to see whether there is any room for lowering any specific items among the extras.

"A suggestion was made that some complementary mechanism be attached to the condenser as a group proposition, so designed that it would fit only the condensers of the group, and sold as a complete unit. This would naturally refer to actuators.

"The entire subject is a topic of vital importance to all of us, and will consume much time at our meeting next week. Consequently, if you have any thought or suggestion along these lines will you please make them before the meeting, so that they can be digested by all parties and arrive at some mutually helpful decision without much loss of time. I would suggest that you send carbon copies of your letters to all parties so as to avoid any loss of time."

At a meeting of Development on March 1, 1938, attended by Messrs. May, Bloom,

Harry De Jur, James, Metzger and Samuel Cohen, the parties considered the "market conditions" and discussed alternatives such as whether to (1) bring out "a common model lower in price than the Model 20", (2), "reduce the base price of Model 20," or (3) "reduce by a fixed percentage the combined price of Model 20 with extras."

Mr. James reported to the Development parties on March 3, 1938 in regard to proposed negotiations with American that Mr. Russell Cramer and Mr. May were to interview Mr. Behringer, President of American, to induce him to join Development. He listed the "broad principles underlying the soliciting of Mr. Behringer's interest to join the group" as follows:

"As understood, Mr. R. E. Cramer and Mr. Bill May will interview Mr. Behringer in an endeavor to get Mr. Behringer to join the C.D.C. group.

"I will take this matter up further in detail in the projected conference with Mr. R. E. Cramer and Mr. May, which, I understood, is scheduled for Tuesday, 11 A. M., at my office. I believe, however, that I might well set down here the broad principles underlying the soliciting of Mr. Behringer's interest to join the group. These are as follows:

"A. Behringer's copying the standards set up by the companies now forming C. D. C. has led to patent infringement. The Cramer ball-bearing patent is now involved in suit. Behringer's recent adoption of a modefied [sic] bar type frame infringes the claims of the Cramer patent No. 2,101,-985 issued recently (December 14, 1937). A new suit or a supplemental suit based on infringement of this Cramer Patent No. 2,101,985 is contemplated. It is desired to avoid these infringement suits and the expenses and risks thereof.

"B. The manufacturing members of C. D. C. and their licensees are now acting in concert to devise new standards to meet new conditions to use, etc. This will involve the obtaining of other patents. Copying of these standards by A. S. P. Corp. will involve other infringements and the bringing of other infringement suits.

"C. To meet A. S. P. lower prices, the member of the C. D. C. group must either lower their prices or bring out new models to meet lower prices of the A.S.P. This means a price war, and, moreover, one based on destructive price competition. This destructive price competition will be avoided and all companies will be enabled to make a fair profit and adopt at the same time the best standards if Behringers' company joins the group.

"D. Both Mr. Cramer and Mr. May will, of course, support these arguments by showing their own confidence in the personal and business relationships established by the cooperation afforded by C. D. C.

"E. Prospective reducing of royalty charges might be held out with the understanding that Behringer's patents would be added to the pool."

On March 3, 1938, Messrs. Price, De Jur, Bloom, Cohen, May, R. Cramer, James and Metzger met and passed a resolution which reduced the price on all Model 20 condensers.

On May 24, 1938, a Mr. Galitz of Reliance wrote Development that: "The big question that arises before we can start any development regardless of spacing or plate thickness is the plate shape. If we are all going to build this condenser so as to work against Steel Package in price we should set up a standard capacity curve that we will all agree to use, and that differs from that of any Steel Package curve now available. This will allow our customer to have more than one source of supply and still leave Steel Package out of the picture as much as possible."

On June 3, 1938, Mr. Metzger reported some differences between the parties over the new model. However, those differences were adjusted. The minutes of a meeting held on August 24, 1938 show that Messrs. Bloom, S. Cramer, May, De Jur, James and Metzger were in attendance. They recite that:

"It was formally agreed Paragraph #6 of the minutes of the meeting held on January 25th, reading as follows: 'It is agreed that no new condenser priced to sell below

the Model 20 will be manufactured by any party without previously having given sixty (60) days' notice of such intention to all parties' is hereby terminated and is rendered null and void.

"Following this resolution, notice of intention to manufacture a new condenser was given by all three companies represented at the meeting."

At the October 7, 1938 meeting attended by Messrs. Bloom, Cohen, De Jur, R. Cramer, May and Metzger "prices on Models 20 and 24 were reviewed and certain extras lowered to meet competitive prices".

However, in spite of the claimed abrogation of the agreement made January 25, 1938, the minutes for the July 13, 1939 meeting show that: "The Administrator then brought before the meeting once more the problem of a cooperative policy regarding new models. All parties are completely mindful of the necessity for contributing to progress in the art, and of course are equally mindful of tooling costs in maintaining such a program. The combined experience and knowledge of condenser design and manufacture of both parties, however, when utilized cooperatively, may do much for the industry in general and at the same time keep costs down to an absolute minimum. All parties are generally agreed that no new models will be offered to the trade as a general proposition without communicating previously to each other the need for such models, and an agreement to produce such new models. The difficulty, however, arises where a new model originates in a customer's labratory, [sic] and the confidential circumstances incident to such new design are of necessity not to be violated. Further study will be given the whole matter, and it will be discussed again at the next meeting."

The Development parties meanwhile obtained the benefit of an opinion of the firm of Fish, Richardson and Neave, as set forth in a letter written by Mr. John B. Cunningham of that firm to Mr. Glover Johnson of the firm of White & Case on May 18, 1939, as follows:

"You have requested our opinion regarding the present licensing arrangement between General Instrument Corporation, Radio Condenser Company, De Jur Amsco Corporation, Reliance Die and Stamping Company, another condenser manufacturer and Condenser Development Corporation. It is, in our opinion, subject to criticism on the ground of violation of the Sherman Anti-trust Act, and while the courts might decide, in possible proceedings brought by the Department of Justice, Federal Trade Commission, competitors or customers, that such criticisms were unfounded, this is not certain. There are plain risks of costly, troublesome and dangerous litigation.

"This conclusion is based upon an examination of an agreement of August 7, 1934 between General Instrument, Radio Condenser, DeJur and Condenser Development, an agreement of May 19, 1937 between the same parties extending the 1934 agreement, another agreement of May 1, 1937 between the same parties and Reliance, and the assumptions based upon a draft registration statement under the Securities Act (proof 4) that General Instrument 'is one of the foremost manufacturers of radio variable condensers in the world, having for the fiscal year ending February 28, 1939, produced a quantity estimated at approximately 30% to 40% of the variable condensers used in home and automobile radio receiving sets manufactured in this country' (proof, p. 2) and that there are only six domestic manufacturers of radio variable condensers, including General Instrument (proof, p. 4).

"The reasons for this conclusion are as follows:

"The Sherman Anti-Trust Act in Section 1 declares illegal 'Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States', while Section 2 declares it illegal 'to monopolize any part of the trade or commerce among the several States'.

"The 1934 agreement was between General Instrument, Radio Condenser and De-Jur, three important manufacturers of condensers, and Condenser Development, a holding company. The manufacturers agreed to convey, for a five year period,

condenser patents to the holding company, which was given the right 'to grant licenses under said Letters Patent for the full term of said Letters Patent' (agreement, para. 1), the holding company by the same agreement granting to each manufacturer a non-exclusive license 'for the full term of all of such Letters Patents or other patent rights' (para. 6). (The registration statement says, p. 2, that these licenses were 'for the same period of years' as the period of assignment by them to the holding company, but this seems erroneous). The licensees paid no royalties, except that as to future patents, royalties or other compensation might be due, depending upon their value (agreement, paras. 3, 4). The validity was admitted of all patents then or thereafter acquired by the holding company, which would mean only patents acquired by it during the five year period (para. 12). The holding company stock was owned equally by the three manufacturers.

"The criticisms which might be made of this arrangement would be that the manufacturers had restrained competition among themselves with respect to granting licenses, so that a competitor could not obtain a license from any one, on its own patents, but would be compelled to go to the holding company. There is no reported decision that such restraint of competition in granting patent licenses could be illegal, but such has been the position of the Department of Justice, as evidenced by U. S. v. Standard Oil, [Co., D.C.], 33 F.2d 617, reversed, Standard Oil [Co.] v. U. S., 283 U.S. 163 [51 S.Ct. 421, 75 L.Ed. 926], where the trial court decided that cross-licenses, wherein the validity of patents was admitted, violated 'the letter and the spirit of the patent law, and are contrary to public policy', 33 F.2d 630. These admissions were thereafter cancelled, and the Supreme Court did not pass upon them, 283 U.S. 181 [51 S.Ct. 427, 428]. The Government also contended that by the cross-licenses 'competition between them in the commercial exercise of their respective rights to issue licenses is eliminated', the Supreme Court, however, finding that 'There is no provision in any of the agreements which restricts the freedom of the primary defendants individually to issue licenses under their own patents alone or under the patents of all the others', 283 U.S. 170 [51 S.Ct. 423, 424]. In U. S. v. Radio Corp., et al., consent decree entered November 21, 1932 in the District of Delaware [3 F.Supp. 23], the Government made the same contention, and, without admitting that it was sound, the cross-licenses were revised so that each party had the right to license under its own patents.

"No opinion is here expressed as to whether such contention is sound, the point being merely that it is an unsettled question.

"All contracts in restraint of trade are not unlawful, but only those which are substantial restraint, Standard Oil [Co. of New Jersey v. U. S.], 221 U.S. 1 [31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann. Cas.1912D, 734]. In the present case, the question of substantial restraint depends upon the amount of business covered by the patents, which apparently is most, if not all, of the business of the manufacturer parties to the agreements (1934 agreement, pp. 2, 3; 1937 agreement, pp. 2, 3), and, presumably, of all the radio condenser business in the United States, there being, according to the registration statement, only one manufacturer not a party. So, unless the agreements are justified by the patent statutes, there would be substantial and, therefore, unlawful restraints of trade.

"The 1937 agreement between General Instrument, Radio Condenser, DeJur, Reliance and the holding company, Condenser Development, provides that prices fixed by the holding company shall be maintained by the other parties, who are manufacturers. With respect to the condensers covered by three specified patents, one of which apparently has been twice sustained by an United States Court (1937 agreement, paras. Fourth, Fifth, Sixth, Eighteenth), it is assumed, for the purposes of this discussion, that these patents are substantial and are not mere pretexts for price fixing, as was the case in Standard Sanitary Mfg. Co. v. U. S., 226 U.S. 20 [33 S.Ct. 9, 57 L. Ed. 107].

"It is now the law that a patent owner can license others to use his patents upon condition that they do not sell the patented product at prices below those fixed by him, because he increases competition by such licensing and the price fixing is a reasonable protection against his business in the patented article being destroyed by his licensees, U. S. v. General Electric [Co.], 272 U.S. 476 [47 S.Ct. 192, 71 L.Ed. 362]. The Department of Justice for years has considered that Bement [& Sons] v. National Harrow [Co.], 186 U.S. 70 [22 S.Ct. 747, 46 L.Ed. 1058], which first clearly decided this point, and this General Electric case, were erroneous, but they are still the law. However, there may be a question of whether an·agreement by the licensee to maintain prices, although in a patent license, is valid, as distinguished from a license or grant of patent rights only for articles sold at the fixed prices, the licensor being free to sue for patent infringement on all articles not so sold. The argument might be made that the first case was a contract outside of the patent monopoly. The latter would seem to avoid such possible criticism.

"In the present case, when the 1937 agreements were made, General Instrument, Radio Condenser and DeJur had non-exclusive, royalty free, licenses under the three specified patents, with no price fixing provisions. Clearly, none considered that it was essential to protect their business against the competition of the other two. It may be contended that the additions of Reliance, and, later, another condenser manufacturer, as licensees, because of the increase thereby of licensed competition, by them, was not a sufficiently important threat to the patented business of the original licensees to justify price fixing.

"Further, it can not be said that the price fixing was to protect the patented business of Radio Condenser, which originally owned the three patents under which prices are fixed, because either General Instrument or DeJur can terminate the price fixing provisions with respect to all under the extension agreement of May 1937.

"Also, this power to terminate the price fixing provisions could be urged as a determining factor in characterizing these two agreements as primarily price fixing agreements, and not patent licenses upon condition as to price. It could be urged that control of the prices as fixed is left in the hands of the original licensees, and not in those of the patent owner.

"Another ground for possible criticism is that General Instrument, Radio Condenser and DeJur 'pooled' their patents, so that, in effect, a combination in restraint of trade was formed, in that way, through their holding company, were enabled, by a multitude of patents, to harass and injure their competitors, by means of patent infringement suits, and threats of same, directed against their competitors and the customers of their competitors. Depending upon what is actually done by the parties to agreements similar in some respects and other facts, it has been held that the mere 'pooling' of patents can be unlawful, Standard Sanitary Mfg. Co. v. U. S.; Indiana Mfg. Co. v. [J. I.] Case Thresting [Mach. Co.], C.C., Wis., 148 F. 21; Lynch v. Magnavox [Co.], 9 Cir., 94 F.2d 883.

"Reliance and the new licensee can terminate the license upon sixty days' notice, but, otherwise, it would seem that they can continue the license indefinitely. The other parties to the 1937 agreement, General Instrument, Radio Condenser, DeJur and the holding company, by an extension agreement of same date, extended for five years the 1934 agreement and also provided that the price maintenance provisions in the agreement between the parties and Reliance may be terminated or cancelled by General Instrument, Radio Condenser or DeJur, causing the holding company to exercise its right to terminate these provisions, as stated in the other agreement (para. Fifteenth).

"Our view is that there is a substantial risk of adverse criticism and costly, troublesome and dangerous litigation, in the present arrangement, but that if the price fixing provisions were terminated, as General Instrument can do, by letter, under paragraph 2 of the extension agreement,

and each licensor had the right to license or sublicense under his own patents and retain for itself royalties therefrom, there would be no such risk. We see no objection to the holding company continuing to grant licenses under the patents of the several manufacturing companies, the royalties therefrom being divided among the patent owners, Standard Oil [Co.] v. U. S. [283 U.S.] 163 [51 S.Ct. 421, 75 L.Ed. 926]."

Mr. James in a letter dated May 27, 1939 addressed to Mr. Stanley Cramer stated:

"This is with reference to the subject of Mr. Bloom's telephone conversation with you made yesterday afternoon.

"In conference with Messrs. Philbin and Cunningham of Fish, Richardson and Neave, Mr. Johnson of White & Case, and Mr. Louis Seadron, agreement was reached yesterday afternoon on the character of the changes that should be made to the C. D. C. agreement of 1934 and to the 1937 and 1938 license agreements (Reliance and Variable), in order to avoid any possible objection that the Department of Justice may conceivably make to patent pooling and price fixing agreements (in view of all the agitation that is going on on this subject at the present time).

"Mr. Philbin has had some experience with the Department of Justice in connection with the suits that were filed against R. C. A. and the other companies associated with them in cross-licensing arrangements, and his recommendations are based upon the insisting views of the Department of Justice, particularly under Mr. Thurman Arnold, at the present time.

"The question is not whether the present agreement violates the Sherman Anti-Trust Laws in so far as the Supreme Court Decisions are concerned, but the question rather is whether the agreements will pass the scrutiny of the Department of Justice at the present time.

"It is my opinion that to meet the new situations that have arisen because of the attitude of the present Administration in Washington, the recommendations made by Fish, Richardson and Neave should be adopted."

He concluded the letter with proposed revisions of their subsisting Development agreements.

Mr. Elmer G. Van Name, counsel for Radio, wrote Mr. Stanley Cramer on May 31, 1939 stating that he had Mr. James' letter of May 27, 1939 and a copy of the letter from Fish, Richardson and Neave and expressed his concurrence in the views of the latter. Mr. Van Name further recommended revisions in the contractual relationships of Development similar to the recommendations of Mr. Cunningham. He again wrote Mr. Cramer on June 1, 1939 and reported on further communications concerning the proposed revisions. On the same date Mr. Cunningham wrote Mr. Van Name and, referring to a telephone conversation of May 31, 1939, summarized objections and proposed corrections to the Development contracts.

The meetings between the Development parties resulted in the signing of an agreement and a supplemental agreement on June 9, 1939 between Development, General and Radio. The first agreement stated in the preamble that:

"Whereas, the parties hereto on August 7th, 1934, entered into a certain patent agreement between themselves and with the De Jur-Amsco Corporation, a New York corporation, now having its principal place of business at Shelton, in the County of Fairfield, and State of Connecticut, then having its principal place of business at 95 Morton Street, in the City, County and State of New York, the said General Instrument Corporation then being a New York corporation with its principal place of business at 225 Varick Street, in the City, County and State of New York; and

"Whereas, by an agreement dated the 28th day of April, 1939, the said De Jur-Amsco Corporation sold and assigned to the General Instrument Corporation and the Radio Condenser Company, all its assets, as well as the stock interest held by it, and the proprietory patent rights and equities in the Condenser Development Corporation, including all its reversionary interests in all patents and patent rights covering variable condensers and tuning devices

described and contemplated by said agreement of the 28th day of April, 1939; and

"Whereas, it is the desire of the parties hereto to revise their said agreement of August 7th, 1934 so as to eliminate the De Jur-Amsco Corporation therefrom by reason of said sales and assignment agreement of the 28th day of April, 1939 aforesaid; and

"Whereas, the parties hereto, in consideration of the provisions hereof, desire to have reassigned to the Radio Condenser Company, three patents originally owned by the said Radio Condenser Company and of which it now owns the reversionary interest, the said three patents being as follows; Cramer 1,800,719, Cramer et al 1,757,357 and Swope 1,620,244; and

"Whereas, the parties hereto desire to make other revisions in the said agreement of August 7, 1934, with the understanding, however, that said agreement of August 7, 1934 is otherwise in full force and effect between the parties hereto save for the revisions or amendments embodied herein and in a supplemental or extension agreement entered into on even date herewith;

"Now, Therefore, in consideration of the premises and of the mutual covenants hereinafter contained, it is agreed as follows:

"1. The parties hereto agree that the said agreement of August 7, 1934 is in full force and effect as between them, the Radio Condenser Company, the General Instrument Corporation, as the first contracting parties, and the Condenser Development Corporation, as the second contracting party, except for the revisions and amendments set forth in the present agreement and in a supplemental or extension agreement entered into on even date herewith, and that the party DeJur-Amsco Corporation is now eliminated as a party from said agreement by virtue of the sale and assignment agreement dated the 28th day of April, 1939, hereinbefore referred to."

The agreement of August 7, 1934 was to be in full force and effect "except for the revisions and amendments set forth in the present agreement and in a supplemental or extension agreement entered into on even date herewith" and the elimination of Am-sco as a party. Radio and General assigned to Development specified Letters Patents and pending applications for Letters Patents, the assignment to be without an equalization fee or further costs to the parties thereto. Both General and Radio were given the right to grant licenses to others and to retain the royalties of patents which they had assigned to Development. In connection with the three patents reassigned to Radio the contract provided:

"The parties hereto agree that any and all licenses already granted heretofore to and under the said three Letters Patents reassigned herein, namely, the patents to Cramer 1,800,719, Cramer et al. 1,757,357 and Swope 1,620,244, be retained in full force and effect save that the said already granted licenses be amended so that the grant on said three Letters Patents shall proceed from the Radio Condenser Company instead of the Condenser Development Corporation, it being understood that the royalties payable thereon and on the remaining patents of said licenses be payable to the second contracting party, the said royalties being in turn payable by the Condenser Development Corporation one half to the Radio Condenser Company and the other half to the General Instrument Corporation.

"The Radio Condenser Company further agrees that on any new license which it may grant prior to Aug. 7, 1944 under said three Letters Patents that (a) if granted on any one or more of these three Letters Patents, one-half of the royalties received by Radio Condenser Company is to be paid by it to General Instrument Corporation; (b) if granted on any one or more of these three Letters Patents along with a license granted by the Condenser Development Corporation on patents owned by the latter, then the royalties are to be paid to Condenser Development Corporation, one half of which is to be paid to Radio Condenser Company and the other half of which is to be paid to the General Instrument Corporation.

"The Radio Condenser Company further agrees that in either event (a) or (b) it will require the licensee to agree to maintain the prices as determined for the bene-

fit of the patent owner by the Condenser Development Corporation for its other licensees."

Radio and General further agreed to cooperate through their respective attorneys in the prosecution of the patents pending and that future patents would be assigned to Development with the costs for prosecuting the same to be paid for by Development regardless of what party prosecuted the patent applications. They cancelled the clause in the 1934 agreement requiring the recognition of the validity of patents and expressly provided that the 1934 agreement provision relating to infringement suits would apply to the three patents reassigned to Radio Condenser. They further provided that: "As supplemental to clauses 4 and 8 of said agreement of August 7th, 1934, each of the first contracting parties agrees to notify in writing each of the other first contracting parties and the second contracting party of any charge made by others, as soon as such charge is made, of alleged infringement of any Letters Patent in the field of radio tuning devices or variable condensers. The second contracting party, at its next meeting to be called within thirty days of such notification, shall decide whether the subject matter of such infringement charge is of common concern to the first contracting parties and to the second contracting party; and in the event that the same be decided to be the common concern of the parties hereto, it is agreed that the second contracting party shall thereupon undertake to investigate the infringement charge and to take any affirmative action thereon that the second contracting party may deem advisable to take, such as the purchasing of any Letters Patent or the application for Letters Patent germane thereto, the arranging for the taking of any license thereunder, the devising of structures in avoidance of infringement thereof, or the making of any settlement appertaining thereto. It is agreed that the subject matter of the infringement charge shall be deemed of common concern when both of the first contracting parties are engaged in the manufacture, use, or sale of radio tuning devices or variable condensers which are chargeable with such alleged infringment of the patent, and continue to manufacture, use, and sell the same in spite of the alleged infringement; and it is further agreed that such subject matter may be otherwise deemed of common concern when the parties hereto so decide. It is agreed that the second contracting party shall pay out of its working fund all costs and expenses incurred thereby; and the first contracting parties severally agree to pay in equal amounts, share and share alike, to the second contracting party all such costs and expenses within ten days from the dates the second contracting party should call for such payments. It is agreed, however, that such payments shall be called for only as the costs and expenses are incurred by the second contracting party and to replenish its working fund. It is agreed that this provision shall be operative for the extension period covered by the supplemental or extension agreement of the parties entered into of even date herewith. Should the second contracting party, within the time above set, fail to act upon the aforesaid notification or decline to consider the subject matter of such infringement charge as of common concern to the parties hereto, then and in that event the interested party may make its own investigation at its own expense, but the purchasing of any application or patent or the taking of a license germane or pertaining thereto shall then be proceeded with under the provisions of clauses 4 and 8 of the said agreement dated August 7, 1934, provided only, however, if the first contracting parties share the expenses of any investigation incurred by the investigating party, otherwise the investigating party shall be free to purchase such application or patent or take a license thereunder apart from clauses 4 and 8 of said agreement of August 7, 1934."

In the supplemental agreement of June 9, 1939 the preamble stated that:

"Whereas, it is the desire of the parties hereto to revise the said supplemental or extension agreement of the 19th day of May, 1937 so as to eliminate the De Jur-Amsco Corporation therefrom by reason of said sales and assignment agreement of the 28th day of April, 1939, aforesaid; and

"Whereas, the parties hereto desire to make other revisions in the said supplemental or extension agreement of the 19th day of May, 1937, consistent with an agreement being entered into between the parties of even date herewith, and to substitute the present supplemental or extension agreement in lieu of the said supplemental or extension agreement of the 19th day of May, 1937, the latter to be considered terminated and rendered of no effect upon the signing of the present agreement; * *"

The supplemental or extension agreement of May 19, 1937 between Radio, General and Development was further extended to August 7, 1944. It was further provided that: "The parties hereto mutually agree that either one of the first contracting parties hereto, upon finding that the price provisions of any license agreement entered into by the Condenser Development Corporation or/and the Radio Condenser Company as licensors or licensor is breached by any party to any said license agreement, may terminate or cancel, upon fifteen (15) days notice in writing, the price schedule provisions as embodied in the agreement dated the 19th day of May, 1937, or any amendment which may be made thereto. Each of the first contracting parties hereto agree that if such breach comprises a violation of the price provisions by the other of the first contracting parties hereto, then and in that event no penalties shall be made or fixed according to the terms of the agreement of the 19th day of May, 1937, which shall be payable to the first contracting party hereto finding or claiming the violation, and no penalties shall be payable to each of the first contracting parties hereto on any other violation claimed at such time."

The adverse decision in the action against American, in the case of Condenser Development Corporation v. Davega-City Radio, Inc., 2 Cir., 108 F.2d 174, was rendered on December 18, 1939. On March 6, 1940, Radio cancelled the authority of Development to fix prices on the three patents mentioned in the agreement of June 9, 1939. On April 27, 1940, Mr. James notified Reliance and Oak that the price fixing clause in its license of May 19, 1937 was cancelled but that Development expected all

other clauses of the license to be observed. Variable received a similar notice from Mr. James on the same date. Mr. Metzger's contract was terminated March 21, 1940.

The price structure followed by Radio and General in 1940 was nearly identical as is shown by the accompanying chart.

Prices—March 1, 1940 to August 1, 1940

| Customer | Part No. | Radio | General |
|---|---|---|---|
| Galvin | 19B 13348 | .65 | .65 |
| | 19B 17838 | .64 | .64 |
| | 19B 20507 | .36 | .36 |
| Philco | 63-0028 | .3925 | .385 |
| | 31-2439 | .39 | .375 |
| | 31-2472 | .40 | .4025 |
| | 31-2482 | .3885 | .3825 |
| | 31-2497 | .3925 | .39 |
| R. C. A. | M 86672-1 | .425 | — |
| | 86672-1 | — | .41 |
| | 87963-26 | .71 | .715 |
| | 91459-2 | — | .4128 |
| | M 91459-2 | .41 | — |
| | 91651-2 | .375 | .37 |

One year later there existed a considerable price differential. In the early part of 1946 a price differential existed as is shown below.

Prices—December 1, 1945 to March 2, 1946

| Customer | Part No. | Radio | General |
|---|---|---|---|
| Galvin | 19K 26959 | .6094 | .69322 |
| | 19B 71135 | .6219 | .77520 |
| | 19B 20507 | .6438 | .71245 |
| Philco | 31-2658 | .6861 | .80435 |
| | 31-2708-2 | .6886 | .83666 |
| | 31-2641 | .6461 | .80462 |
| | 31-2659 | .7125 | .85147 |
| | 31-2689 | 1.0811 | 1.27028 |
| | 31-2636 | .6986 | .81924 |
| | 31-2705 | .7436 | .85833 |
| R.C.A. | 922111-5-0 | .7094 | — |
| | 922111-5 | — | .89161 |
| | 91651-1-0 | .6886 | — |
| | 91651-1 | — | .84984 |
| | 920329-501 | .6438 | .79462 |
| United Scientific Labs. | 2003 | .6188 | .74792 |
| | P104J10-2 | .625 | .74192 |
| Zenith | 22-1373 | .8813 | 1.14701 |
| | 22-1363 | .8469 | .96904 |

Commencing in the fall of 1940, variable condenser manufacturers were engaged in servicing war contracts. A serious shortage developed necessitating assistance of the United States in constructing plant facilities operated by Radio, and its affiliates, Manufacturer and Western. The system of

priorities and price control was instituted by the United States in 1942 and continued until 1945. During this period there was little if any civilian production.

In October of 1943, Oak Manufacturing Company, successor to Reliance by purchase of its business in 1940, was granted a license by Development.

In 1944 Winters & Crampton applied for a license. It was offered a license by Development which included all of the patents pooled by the Development parties, required the admission of the validity of all patents, and contained a provision for payment of a $10,000 yearly minimum royalty. No further action was taken to perfect a license. In the fall of 1945 and early part of 1946 Kings Electronic Company, Lear Incorporated, National Electric Machine Shop and Robert L. Kahn applied to Development for licenses. They were offered licenses similar in form to that offered Winters & Crampton except that the royalty fee was set at $5,000, but in no case was a license granted. Subsequent to the initiation of this suit, however, Development offered a license for the manufacture of a single model condenser requiring only a limited number of patents at a lowered royalty rate.

In 1944 Manufacturer merged with Western. In March of 1946, prior to the institution of this action, the principal manufacturers of variable condensers in the United States were Radio, General, Variable, Western, Oak and American with American the only manufacturer not a licensee of Development.

On the expiration of the agreement of 1939 in 1944 no formal action was taken until March 1, 1946 when Radio, General and Development signed an agreement expressly effective as of August 7, 1944 with a term of five years from March 1, 1946. In the recital it was stated: "the parties hereto on August 7, 1934, entered into a certain patent agreement (also then including the DeJur Amsco Corporation, a New York Corporation), which involved the grant from the first contracting parties [Radio and General] to the second contracting party [Development] of certain patent rights and powers for a period of five years, and thereafter extended the period of said grant for a further period of five years, and, to wit, to August 1944." The agreement further recited that Development had granted a number of licenses, the following of which were in force:

"(a) Non-exclusive licenses, free of royalty, to each of the first contracting parties and to Western Condenser Company, a corporation of Delaware, located at Watseka, Illinois, on all of the Letters Patents and Applications for Letters enumerated in Schedules A to D hereof, for the full terms of said Letters Patents;

"(b) A non-exclusive, royalty-bearing license to the Variable Condenser Corporation, a corporation of New York, on the Letters Patents of said Schedules A to D hereof;

"(c) A non-exclusive, paid for and paid-up license to the Oak Manufacturing Company * * *.

"(d) A non-exclusive, royalty-bearing license previously conveyed by the DeJur-Amsco Corporation to the Western Electric Company, and assumed by the second contracting party, in and to the Letters Patent to Shaw 1,786,134 of December 23, 1930, of Schedule C hereof."

The agreement, by lists appended thereto as Schedules A, B, C, D, and E, vested Development with 79 patents and one application, including two of the three patents returned to Radio by the 1939 agreement.

It was further provided:
*Additional Patents and Applications* (Paragraph 2)
"It is agreed that all inventions, Letters Patents and applications for Letters Patent of each of the first contracting parties in the field of variable condensers and tuning devices for variable condensers which may be made during the five-year period of this agreement, as well as those which may have been heretofore made and/or which may be pending or granted at or prior to the effective date hereof, namely, August 7, 1944 (excepting only Letters Patents and applications enumerated in Schedules A, B and E), shall be divided into two classes by each of the first contracting parties, such classes being as follows, viz.:

"Class A: Letters Patent, applications, and inventions which the first contracting parties severally shall have the right to retain for its exclusive benefit, and,

"Class B: Letters Patent, applications and inventions which the first contracting parties severally shall decide to assign to the second contracting party for the term and consideration hereinafter set forth.

"*Powers Granted—Equalization Fee* (Paragraph 3)

"The first contracting parties severally agree at the meetings called for in section 4 hereof to disclose all of their respective Class B Letters Patents, applications for Letters Patents, and inventions thereof, and to assign to the second contracting party for the five-year period of this agreement, the full right, title and interest in and to the same, upon the basis of an equalization fee or fees as defined hereinbelow, together with the power for such period, to grant licenses under said Letters Patents and said applications for Letters Patents for periods up to the full terms of said Letters Patents. In order to effectuate the same, each of the first contracting parties agrees to assign by a separate instrument in writing to the second contracting party, its full right, title and interest in and to its such Class B Letters Patents and applications for Letters Patents, together with all rights to sue for all past infringements thereof and for infringements occurring during said period of five years and to collect the profits and damages resulting from all such infringements.

"Nothing contained in this or in any prior agreement shall in any way impair, impeach or encumber the exclusive rights of a first contracting party in any Letters Patent, application or invention classified by it as Class A.

"Class A inventions, applications or patents may at any time be changed to Class B by the owner thereof, but Class B inventions, applications or patents shall not be changed to Class A except by the mutual consent of all parties hereto.

"The second contracting party agrees to pay for all Class B patents, applications, and inventions the cost actually paid, or hereafter paid, by the respective first contracting parties for the preparation and prosecution of their respective applications for Letters Patents, such cost to be paid by the second contracting party out of its working fund to the Radio Condenser Company or the General Instrument Corporation, as the case may be, as and when each such application issues into a patent or the prosecution thereof is otherwise terminated, or as and when any such patent is purchased under Section 5 hereof.

"*Interim Meetings* (Paragraph 4)

"The first contracting parties agree to confer in meeting assembled to be called at any time at the request, on thirty (30) days notice, of either of the first contracting parties, such meetings to be held at least twice each year, to give attention to all the Letters Patents granted to or acquired by the respective first contracting parties in the periods prior to such meetings and all the applications for Letters Patents filed or acquired by the respective first contracting parties in said periods relating to variable condensers and tuning devices for variable condensers which the respective first contracting parties have (a) theretofore manufactured and marketed; (b) or are offering for sale and are in process of tooling up for manufacture and marketing, with the view to (a) informing or confirming to the other parties of the class in which any invention has been placed by the owner, i. e. whether they are Class A or Class B patents and applications, and (b) the considering of the granting of licenses (upon mutually satisfactory terms) to either of the first contracting parties under Class A Letters Patent and applications owned by the other of the first contracting parties. It is agreed that each of the first contracting parties shall give timely notice to the other of the first contracting parties of all Letters Patents and applications that are to be the subject of consideration at each such meeting under the terms hereof, disclosing only whatever contents, if any, of pending applications that such first contracting parties may severally deem it advisable to disclose so as to enable timely

investigation thereof to be made by such other party.

*"Purchased Patents—Licenses From Others* (Paragraph 5)

"Each of the first contracting parties agrees to notify in writing the other of first contracting parties and the second contracting party, giving full particulars thereof, of any invention, application for Letters Patent, Letters Patent or any patent rights owned or controlled by others and capable of sub-license, in the field of variable condensers and tuning devices for variable condensers, deemed by it desirable for purchase in whole or part for the acquisition of an exclusive license, except such thereof as may be made at their own expense by officers of the first parties respectively. The second contracting party shall have forty-five (45) days thereafter within which to signify in writing whether or not it will or will try to purchase or secure the exclusive license to or otherwise acquire such invention, application, Letters Patent or patent right, and said second contracting party shall make such purchase or acquisition thereof or secure such exclusive license thereto only upon the approval of both of the first contracting parties. Should such second contracting party fail or decline to make such purchase or acquisition or secure such exclusive license within said forty-five (45) days after notice, then the party first giving notice of such invention, application, Letters Patent or other patent right shall have the sole right as against the other of the first contracting parties to purchase or acquire such invention, application, Letters Patent or patent right as its own. Upon purchase or acquisition in whole or part of any Letters Patent, application for Letters Patent or any patent right, or the obtaining of the exclusive license thereto, such of the first contracting parties shall classify said invention, application, Letters Patent or other patent right in either Class A or Class B, to be dealt with in the manner provided for in sections 2, 3 and 4 hereof; provided that the second contracting party shall not be obliged to pay for any Letters Patent, application or invention classified in Class B more than the reasonable cost of preparation and prosecuting the application for Letters Patent. Should the second contracting party purchase such invention, application or Letters Patent, the cost thereof and of obtaining a patent on any still pending application shall be borne by said second contracting party.

"In the exceptional event where time is of the essence in affecting the purchase or acquisition of an invention, application, Letters Patent or other patent right, the one of the first contracting parties involved may purchase or acquire the same without first notifying the other of the first contracting parties or the second contracting party thereof; however, in said event, the said involved contracting party shall without delay offer to resell or otherwise dispose of said invention, application, Letters Patent or other patent right to the second contracting party at the same purchase or acquisition price paid by said involved contracting party therefor, and the second contracting party shall have forty-five (45) days after being notified thereof within which to signify whether or not it will purchase or otherwise acquire the same, but not until the second contracting party shall have failed to purchase within such period shall the owner thereof have the right to classify it as Class A or B.

"It is agreed that neither of the first contracting parties shall independently acquire from others any non-exclusive license or other indivisible right to manufacture or market radio tuning devices for variable condensers or variable condensers under any United States Letters Patents, applications for Letters Patents or inventions without first giving the second contracting party the opportunity to acquire the same jointly for the first contracting parties or either of them desiring the same. Each of the first contracting parties agrees that it will first notify in writing the other of the first contracting parties and the second contracting party that it deems it desirable that such license or other indivisible right be acquired, and in such notice full information of such right shall be given. The second contracting party shall have forty-five (45)

days thereafter within which to signify in writing whether or not it will acquire such license or other indivisible right for and on behalf of either or both of the first contracting parties, it being agreed that the second contracting party shall have the power to acquire such right for sublicense to both of the first contracting parties or either of them desiring the same and the terms and conditions of the sublicense shall be the same for both. Should the second contracting party fail or decline to acquire such right within the time set, then the first contracting parties may each and severally acquire such license or other indivisible right independently and a copy of the license or other agreement thereon shall be filed with the second contracting party.

"The proponent of purchase or exclusive license as above shall not have any right to object to acquisition thereof in corporate meetings of the second contracting party.

"*Exercise of Powers* (Paragraph 6)

"The second contracting party covenants and agrees to grant during the term of this agreement, non-exclusive licenses, free of royalty, to each of the first contracting parties and to the Western Condenser Company, provided, however, that the stock control of the said Western Condenser Company be then in the ownership of Stanley S. Cramer and Russell E. Cramer, either or both, on all inventions, applications for Letters Patents, Letters Patents and any other patent rights which shall hereafter be conveyed or assigned to or acquired by the second contracting party, said grants to extend for the full term of all such Letters Patents or other patent rights. It is agreed that the second contracting party shall have power during the term of this agreement to grant non-exclusive licenses to other persons, firms or corporations, upon royalty terms to be agreed upon, such licenses to be granted on any or all of the Letters Patents enumerated in Schedules A to E hereof, and on any or all other inventions, applications for Letters Patents, Letters Patents or other patent rights, which said second contracting party shall hereafter acquire; and such licenses may extend for the full term of any or all such Letters Patents or other such patent rights.

"*Re-assignment of Patents* (Paragraph 7)

"The second contracting party covenants and agrees to effectuate the following re-assignments at the end of the term of this agreement:

"(a) To re-assign to the Radio Condenser Company, all of the unexpired patents of the Letters Patents and applications enumerated in Schedule A hereof and all such Letters Patents and applications which shall be conveyed or assigned by the Radio Condenser Company to the second contracting party during the term of this agreement;

"(b) To re-assign to the General Instrument Corporation, all of the unexpired patents of the Letters Patents and applications enumerated in Schedule B hereof and all such Letters Patents and applications which shall be conveyed or assigned by the General Instrument Corporation to the second contracting party during the term of this agreement;

"(c) To re-assign a one-half undivided interest to each of the Radio Condenser Company and General Instrument Corporation, of the full right, title and interest in and to the unexpired patents of the Letters Patent enumerated in Schedules C and D hereof, and any and all such other Letters Patents and applications for Letters Patents which shall be acquired during the term of this agreement by the second contracting party. It is agreed that thereafter no licenses shall be granted to others on such Letters Patents or applications of this clause (c), nor shall any portion of said patents and applications be sold save in conformity with section 14 hereof, except the same be done by mutual consent of Radio Condenser Company and General Instrument Corporation and providing for equal division amongst them of the royalties or other proceeds thereof."

It provided for a working fund which would be replenished, when it fell below $3,000, by assessments upon Radio and General. The fund was to be used to meet costs of litigation "and of administering the monies expended and royalties received

in the granting of licenses". Provision was also made to determine disputes between the parties by arbitration.

It was further provided:
*"Infringement Suits* (Paragraph 10)

"(a) Brought by Others

"It is agreed that any suit brought by others during the term of this agreement against any one of the first contracting parties for alleged infringement of any United States Letters Patent because of its manufacture, use or sale of variable condensers or tuning devices for variable condensers also manufactured and sold and which are continued to be manufactured and sold in spite of the alleged infringement by the other of the first contracting parties, and in no other event, shall be defended or settled by the second contracting party; and the second contracting party shall pay out of its working fund all costs and expenses of such suit until the termination thereof whether or not any such suit shall be continued beyond the said five year period. It is agreed, however, that the second contracting party shall not be liable for any damages or profits assessed against the defendant party in any such suit and that such assessment shall be the concern only of such defendant party. The assuming of the defense, if any, of any such suit shall be obligatory upon the second contracting party, and the first contracting parties severally agree to pay in equal amounts, share and share alike, to the second contracting party its costs and expenses of such defense within ten days from the dates the second contracting party calls for such payments. It is agreed, however, that such payments shall be called for only as the defense costs and expenses are incurred by the second contracting party and to replenish the said working fund.

"It is agreed that in any suit brought by others during the term of this agreement against either of the first contracting parties for alleged infringement of. any United States Letters Patent because of its manufacture, use or sale of variable condensers or tuning devices for variable condensers which have not been manufactured or sold by the other of the first contracting parties, said first contracting party being sued shall have the right to use any of the Letters Patents originally owned or controlled by it for the purpose of counterclaim in such suit or for the purpose of countersuit, and it is agreed that the second contracting party shall reconvey such rights in such Letters Patent or Patents to said first contracting party to enable the latter to set up such a counterclaim or countersuit, it being agreed that such first contracting party shall not use such Letters Patents except for this purpose and shall reconvey the same to the second contracting party as soon as this purpose has been served.

"It is agreed that in any suit brought by others during the period of this agreement against either one of the first contracting parties for alleged infringement of any United States Letters Patent because of its manufacture, use or sale of variable condensers or tuning devices for variable condensers which have not been manufactured or sold by the other of the first contracting parties but which shall be manufactured or sold at any time after the bringing of any such suit by such other first contracting parties, then and in that event, the said other party shall assist in the defense of such suit if the suit is still pending and shall share part of the costs of defense of the same whether the suit is still pending or has been completed, the manner of such assistance and the amount of such sharing in cost to be determined by the involved parties at the time such other party manufactures or sells the involved device; should the parties fail to agree upon the manner of the assistance to be rendered to the party being sued or upon the manner of sharing the cost of the defense, the first contracting parties agree that the matter may then be referred to a Board of Arbitration constituted as herein provided in Section (9) hereof whose decision shall be final and binding on the involved parties.

"(b) Brought by the Second Contracting Party

"It is agreed that the second contracting party, upon request made by both of the first contracting parties and not otherwise, shall bring and prosecute any and all suits against others for infringement of any of the Letters Patents in Schedule A to E hereof or any other Letters Patents to which the second contracting party shall have title under this agreement. It is agreed that the costs and expenses of any such suit incurred until its termination shall be paid by the second contracting party out of its working fund, and that any deficiency shall be assessed in equal shares against both of the first contracting parties, such assessed shares to be payable by the first contracting parties severally within ten (10) days of the dates the second contracting party calls for such payments. It is agreed that any monies derived from any such suit, whether in the form of profits, damages or costs obtained in such suits, or royalties obtained from licenses granted under the involved Letters Patents or otherwise shall go to the working fund of the second contracting party.

"(c) Charges of Infringement made by Others

"Each of the first contracting parties agrees to notify in writing the other of the first contracting parties and the second contracting party of any charge made by others, as soon as such charge is made, of alleged infringement of any Letters Patent in the field of variable condensers or tuning devices for variable condensers. The second contracting party, at its next meeting to be called within thirty (30) days of such notification, shall decide whether the subject matter of such infringement charge is of common concern to the first contracting parties and to the second contracting party; and in .the event that the same be decided to be the common concern of the parties hereto, it is agreed that the second contracting party shall thereupon undertake to investigate the infringement charge and to take any affirmative action thereon that the second contracting party may deem advisable to take, such as the purchasing of any Letters Patent or application for Letters Patent germane thereto, the ar-

ranging for the taking of any license thereunder, the devising of structures in avoidance of infringement thereof, or the making of any settlement appertaining thereto. It is agreed that the subject matter of the infringement charge shall be deemed of common concern when both of the first contracting parties are engaged in the manufacture, use, or sale of variable condensers or tuning devices for variable condensers which are chargeable with such alleged infringement of the patent, and continue to manufacture, use, and sell the same in spite of the alleged infringement; and it is further agreed that such subject matter may be otherwise deemed of common concern when the parties hereto so decide. It is agreed that the second contracting party shall pay out of its working fund all costs and expenses incurred thereby; and the first contracting parties severally agree to pay in equal amounts, share and share alike, to the second contracting party any deficiency in such costs and expenses within ten (10) days from the dates the second contracting party should call for such payments. It is agreed, however, that such payments shall be called for only as the costs and expenses are incurred by the second contracting party and to replenish its working fund. Should the second contracting party, within the time above set, fail to act upon the aforesaid notification or decline to consider the subject matter of such infringement charge as of common concern to the parties hereto, then and in that event the interested party may make its own investigation at its own expense, but the purchasing of any application or patent or the taking of a license germane or pertaining thereto shall then be proceeded with under the provisions of section 5 hereof, provided only, however, if the first contracting parties share the reasonable expenses of any investigation incurred by the investigating party payable upon twenty (20) days notice, otherwise the investigating party shall be free to purchase such application or patent or take a license thereunder apart from section 5 hereof.

"*Future Inter-parties Interferences and Suits* (Paragraph 11)

"All interferences in the United States Patent Office between patents or applications for patents relating to variable condensers and tuning devices for variable condensers of the first contracting parties, wherever they cannot be terminated by simple settlement, shall be prosecuted by the respective parties, upon an agreed to state of facts wherever possible, to a hearing and decision by the Examiner of Interferences on the merits, which decision shall be acquiesced in by the parties as final without appeal. It is agreed that this procedure shall not be construed as creating a bar to either of the first contracting parties to setting up any defense it might otherwise set up in any infringement or other suit brought on or involving such patent or patents. All infringement suits between the first contracting parties, shall be prosecuted by the respective parties at their own respective cost and expense."

Provision was made for the extension of the agreement for a further period of years under conditions specified. As of the date of this suit, this contract was in force.

Conclusions.

All of the parties having moved for summary judgments and there being no genuine issues as to the material facts heretofore set forth, after hearing the arguments of the parties the court is constrained to the following conclusions.

The purpose in organizing Development and executing the August 7, 1934 agreement, as recited therein, was to halt extensive patent litigation which the parties thereto had previously engaged in. Subsequent licenses contained expressions of a similar motive. As an example, in the Reliance agreement of May 9, 1937 the motive of the Development parties is set forth as follows:

"Whereas, there are pending in the United States District Courts a number of suits in Equity brought for infringement of a number of Letters Patents contained in said Schedules A, B and C, filed by the Licensor [Development] against certain customers of the Licensee [Reliance], in one of which suits the Cramer patent No. 1,800,719 has been declared valid and infringed, and in which suit an appeal is now pending in the Circuit Court of Appeals for the Second Circuit; and

"Whereas, it is the desire of the Licensor and the Licensee to settle and terminate all said pending litigation and to avoid wherever possible further litigation between them, to enable the Licensee without infringement and without continued litigation to manufacture and market the said condensers as well as to adopt the most effective styles and standards therefor under said Letters Patents as aforesaid; * * *."

From the initial 1934 agreement General and Radio controlled well over 50% of the radio condenser industry in the country and dominated the industry. Although they contended that the primary purpose of their agreements was to resolve patent litigation, the course of conduct followed by them demonstrates that it was to insulate their patents from outside and inside attacks in order that they might continue a dominating position in the variable condenser industry to their mutual advantage and to the restraint of trade in interstate commerce. They admitted that they agreed that where there was a joint interest, the pool would defend an infringement suit brought against either of the pooling parties but contended that there was nothing inherently wrong in a joint defense against infringement suits brought by others. Similarly they argued that the very purpose of settling patent disputes would have been defeated if a party could thereafter turn about and purchase a patent of someone else and use it as a threat of litigation against the other pooling parties and therefore a necessary incident to the purpose of the pooling arrangement was to place patents purchased from others in the same category as patents developed and owned by the respective parties. But their subsequent conduct demonstrates that there was an additional purpose guiding the Development parties and which brought about conditions deleterious to competition.

The effect of the creation of Development as a device whereby the patents of

General and Radio together with Amsco could be lodged in a pool was to tighten the clamp of domination upon the industry, for by virtue of their agreements, General and Radio created in Development a device designed to stretch the monopoly of their respective individual patents to a monopoly of patents not normally available to them in the following manner:

(1) They acquired for purposes of aggressive litigation against alleged infringers the combined patents of each other and similarly provided for their own defense the use of each other's patents where their creature, Development, was sued or where they were individually sued.

(2) They achieved a greater control of the variable condenser industry by the licensing of their respective patents than the patent law contemplated they should have as individual patent holders for by combining the patents in Development under the scheme of their agreement they could collectively fix conditions and royalties that would have been impossible without the device of Development.

(3) Up until 1940 they fixed the prices and conditions under which licensees could have the use of patents in a manner to which they would not have been entitled as individual respective patent owners.

The defense asserted for them that all of this constituted a legal patent pool within the contemplation of the decisions of the United States Supreme Court is untenable. It is true, as they assert, that in the case of Standard Oil Co. v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926, certain patent pooling was countenanced and that the court in that case specifically held that legitimately conflicting patent claims or threatened patent interferences could be settled by contract rather than litigation without violating the Sherman Act, stating: "Unless the industry is dominated, or interstate commerce directly restrained, the Sherman Act does not require cross-licensing patentees to license at reasonable rates others engaged in interstate commerce." 283 U.S. at page 172, 51 S.Ct. at page 425. But it sounded a warning that: "If combining patent owners effectively dominate an industry, the power to fix and maintain royalties is tantamount to the power to fix prices." 283 U.S. at page 174, 51 S.Ct. at page 425. The reason was based upon the fact that: "an agreement for cross-licensing and division of royalties violates the Act only when used to effect a monopoly, or to fix prices, or to impose otherwise an unreasonable restraint upon interstate commerce." 283 U.S. at page 175, 51 S.Ct. at page 425. The Court laid down the proposition that: "Any agreement between competitors may be illegal if part of a larger plan to control interstate markets [cases cited]. Such contracts must be scrutinized to ascertain whether the restraints imposed are regulations reasonable under the circumstances, or whether their effect is to suppress or unduly restrict competition. [Cases cited.] * * * And pooling arrangements may obviously result in restricting competition." 283 U.S. at page 169, 51 S.Ct. at page 423.

In Standard Oil Co. v. United States, supra, the Court held that there was shown no monopoly, no unreasonable restriction of competition, no proof that the defendants could by reason of their contracts fix the market price, and that only about 26% of the total production of the industry involved was affected.

In explaining the Standard Oil case in U. S. v. Line Material Co., 333 U. S. 287, 313, 68 S.Ct. 550, 563, 92 L.Ed. 701, the Supreme Court stated that: "Even in Standard Oil Co. v. United States, 283 U. S. 163, 51 S.Ct. 421, 75 L.Ed. 926, where an arrangement by which the patentees pooled their oil cracking patents and divided among themselves royalties from licensees fixed by the pooling contracts was upheld, the theory was reiterated that a price limitation for the product was unlawful per se. 283 U.S. at pages 170, 173, 175, 51 S.Ct. at pages 423, 425, 75 L.Ed. 926. Of course, if a purpose or plan to monopolize or restrain trade is found, the arrangement is unlawful. 283 U.S. at page 174, 51 S.Ct. at page 425, 75 L.Ed. 926. The Government's contention in that case that the limitation on royalties in itself violated the Sherman Act by fixing an element in the price was dismissed because

the Court was of the view that controlled royalties were effective as price regulators only when the patentees dominated the industry. 283 U.S. at page 174, 51 S.Ct. at page 425, 75 L.Ed. 926. This domination was thought by this Court not to have been proven."

In this case General and Radio control more than 50% of the industry. After Amsco joined with them in the agreement of 1934, in quick succession they subjected Federal, Reliance, and Variable to litigation terminated by licenses, denied Rae a license, leaving American as the only unconquered competitor. It preserved its independence by resisting Development's suit and in 1939 inflicted the first major defeat upon the defendants when it emerged successful in the suit of Condenser Development Corp. v. Davega-City Radio, Inc., supra, in which one of the so-called basic patents was declared invalid.

By the agreement of May 1937 the Development parties determined to employ an Administrator whose duties were to execute and bring into being the control of the relations of the parties inter se, and with the balance of the industry, as was contemplated in the totality of the Development scheme. Accordingly, the contract was signed for Mr. Metzger to act as Administrator and he served in this office from 1937 until 1940. His activity as the controller of business relations subject to the approval of the parties was a clear index of their desire to institute a form of policing of the entire variable condenser industry. The defendants resented the plaintiff attributing statements by Mr. Metzger concerning business policies, strategies and tactics in connection with the conduct of the parties as between themselves and their competitors. The evidence, however, associates and integrates his activities with these of the parties too closely to permit any such exculpation. Mr. Metzger was industrious and energetic in carrying out the design of his employers and he brought initiative and imagination to his job, nor is there evidence that this was not appreciated by the defendants at the time. It is true that when the price schedules were abandoned in 1940,

Mr. Metzger's position was likewise declared vacant, and no similar office was reestablished. But by this time the nation had arrived at the immediate pre-war period in which prices and competition were fading into an economy of military production. There was no longer a need for an internal industrial policing of the production of variable condensers within the United States from Development's point of view. As seen in the entire pattern of the conduct of the Development parties the activities of their Administrator and themselves they fitted into the framework of the conspiracy.

Note has been taken of the seemingly plausible recitals by the defendants that their patents at times were held valid and infringed by trial courts and that their adjustment of their patent differences, at least in one case, was given informal court commendation. However, these were but individual incidents in the economic road traveled by the defendants toward their objective of domination of their industry and pale in significance when their activities are viewed in their entire and total aspect. American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575; U. S. v. Griffith, 334 U.S., 100, 105-106, 68 S.Ct. 941, 92 L.Ed. 1236.

■ Direct price fixing was abandoned as such as of April 1940 when the notices were sent out to all parties in interest. The defendants submitted that this was pursuant to the decision in Condenser Development Corp. v. Davega-City Radio, Inc., 108 F.2d 174, rendered by the Second Circuit Court of Appeals on December 18, 1939, in which Cramer Patent No. 1,800,719 was declared invalid. However, concomitantly with this litigation and during the spring and summer of 1939, the Development parties conducted a self-study of the structure of their agreements vis-a-vis the anti-trust laws. They applied to counsel for an opinion as to the legality of their position. Heretofore there has been set out in full or in resume the correspondence of the parties and their counsel in this regard. It is plainly apparent therefrom that the parties suspected that they might be acting outside the law. The opinions of counsel hardened these sus-

picions into something more than conjecture. The course was laid out to be followed in the future. It is obvious that this was designed to accomplish the same objectives sought by their previous agreements and arrangements under a new, and if possible, legal form. The mere fact that the Development parties intended to accomplish a result by legal methods and claimed good intentions is not germane where infractions of the antitrust laws are involved.

 That a specific intent is lacking to restrain trade or to establish a monopoly will not form a defense against an antitrust complaint for "It is sufficient that a restraint of trade or monopoly results as a consequence of a defendant's conduct or business arrangements." U. S. v. Griffith, 334 U.S. 100, 105, 68 S.Ct. 941, 944. The characterizations placed upon their conduct by the defendants or expressions of motive in their isolated arrangements avail nothing in the teeth of the sum total of their acts, for as was stated in the case of American Tobacco Co., v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575, "Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition." 328 U.S. at page 809, 66 S.Ct. at page 1139.

The Development parties contend that their price fixing arrangements prior to 1940 were legitimately based upon patents in compliance with the decision in U. S. v. General Electric Co. et al., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. But the price fixing was not the individual act of the original corporate owner of the patent but of Development to whom the incorporating parties had delegated authority to license to their mutual advantage when the combination of strength was sufficient to dominate the industry.

In the case of United States v. Line Material Co., supra, competitors held interdependent patents and neither could be commercially exploited without the use of the other. In the light of this condition, one competitor granted a license to the other with a provision permitting licensing to manufacturers provided the equipment manufactured under the patents involved conformed to the price structure fixed by the patent owner. The same agreement was made by the other competitor. Thereafter, the holder of the minor patent issued a number of licenses to manufacturers containing sales limitations. Upon those facts the trial court held the arrangement not to be violative of the Sherman Act on the authority of the General Electric case. However, the United States Supreme Court reversed and held that the combination of different patentees for the purpose of fixing the sales prices was unlawful under the Sherman Act and that others who subsequently entered into license arrangements containing price fixing provisions with knowledge of the contracts are equally subject to the prohibitions of the anti-trust laws.

The Line Material case is immediately applicable, therefore, to the arrangement followed by the Development parties from 1934 to 1940. The only distinguishing feature is the fact that Development rather than one of the patent owners was the licensor by virtue of the assignment to it of the patents held by General and Radio but this feature is a mere matter of form and does not alter the substance of the arrangement.

 There can be no question but what the agreement of August 7, 1934 with its creation of Development as the alter ego of the other contracting parties and its modifications of May 19, 1937 and June 9, 1939 with the deliberate price fixing arrangements arising therefrom are prima facie proof of a conspiracy to restrain competition in the variable condenser industry. Schine Chain Theatres v. U. S., 334 U.S. 110, 116, 117, 119, 68 S.Ct. 947, 92 L.Ed. 1245; United States v. United States Gypsum Co., 333 U.S. 364, 388–389, 68 S.Ct. 525, 92 L.Ed. 746; United States v. Line Material Co., 333 U.S. 287, 314–315, 68 S. Ct. 550, 92 L.Ed. 701.

Commencing in the fall of 1940, the economy of the United States was geared to a concerted war effort and from 1942 to 1945

there was no civilian production as was admitted by the defendants in their brief. Priority and price controls rendered unnecessary any form of price stabilization by private contract and it was not until 1946, when the parties were free of controls, that the necessity for private agreement again arose. However, in 1944, the Department of Justice commenced an investigation of the activities of the defendants. Forewarned that their conduct was the subject of investigation, it was but natural for General and Radio, upon resumption of their relationships, to avoid a semblance of price fixing.

It would appear, at first blush, that the agreement of April 1939, in which Amsco sold its stock in Development, assigned its eleven patents and relinquished its license under all the patents for the sum of $50,000 paid by General and Radio in which was incorporated Amsco's covenant not to compete with them in the manufacture of variable condensers for a period of ten years and in which restrictions were placed upon Amsco's sale of its tools in the United States, was reasonable to protect the interest of the purchasers as they have argued. They likewise contended that the said agreement, when construed with the subsequent agreement of June 10, 1939 between General and Radio in which permission was granted General to purchase tools of Amsco and a similar permission accorded Radio by General provided either of them upon such purchase in turn restricted any sale of such tools, comprised, so to speak, a "part of the res gestae and should be considered as one transaction". This was true, but not in the sense implied by the defendants. Had this agreement of sale been effected between two independent parties perhaps the covenant and restrictions would have been valid, as argued by the defendants. But here two competitors, combined through the device of a patent holding corporation, jointly bargained for the advantages of the restrictive covenants from the outgoing Amsco and then proceeded to agree to restrict each other. The argument advanced by them presumed lawful initial arrangement as to tools in the agreement of April 28, 1939 and in the later agreement between the defendants of June 10, 1939. This is not tenable so far as the tools of Amsco were concerned. These contracts were but naked agreements between competitors designed to restrict the tools and equipment from falling into the open market. The fact that the tools came ultimately into the use of Radio, or its subsidiary, Manufacturer, in large part, does not validate the intentions or the expressed agreements of the parties as plainly enunciated in their contracts. The cases cited by the defendants would govern under circumstances different from those under which the parties in this case engaged. Hence it can only be held that these contracts in so far as restrictions on the use of tools were concerned were not only invalid in themselves as in restraint of trade in violation of the Sherman Anti-trust Act, but in view of the total relationship of all of the parties, they constituted an illuminating element in the entire light in which the parties dealt with the anti-trust laws.

There appears to be much contradictory evidence in regard to the plaintiff's allegations of allocation of customers, refusal to manufacture tools for employment in the variable condenser industry, agreements in regard to models, the so-called price war against American and the alleged refusal of Amsco's request for the lifting of restrictions against it and to license it to reenter the field. Of course these issues therefore may not be resolved on the motions at bar. But ample evidence demonstrating that the members of Development and their licensees, who, except for American, constituted the producers of a heavy percentage of all of the variable condensers in the United States, engaged together in conferences and meetings to decide upon models, changes and standardization thereof, and until 1940, on direct fixing of prices, is undisputed and admissible.

Much material was submitted on both sides on the charges raised by the plaintiff that the conduct of Development amounted to an inequitable refusal to license Rae, Winters & Crampton, Amsco, Kings Electronic, Lear Incorporated, National Electric Machine Shops and Robert L. Kahn.

There has been noted the quantity of evidence to illustrate on the one hand the extended orbit of terms (alleged exorbitant royalties, requirements to be licensed on all of Development's patents and requirement that validity of all be acknowledged) sought to be exacted from the applicants for licenses and on the other the attempted justification for such terms and the fact that in applications made after the 1946 agreement, the requirements on the part of Development with regard to the scope the license must embody were diminished (applicants not required to be licensed on all patents held by Development) as well as the fact that in no instance in the cases of the applicants previously listed was a license consummated. This evidence goes, however, rather to the effect of the basic agreements between Development parties and not to the fundamental cause. Under the view taken of the basic contractual relations between the Development parties that they acted illegally ab initio and continued that relationship throughout, a decision that the terms under which licenses were offered or that they were too harsh becomes unnecessary. Development simply did not have valid licenses to offer as a result of the inherent vice in the scheme in which it was the creature of two patent holders who dominated the variable condenser industry.

When the 1946 agreement was signed Radio and General estimated their proportion of the variable condenser business to be from 65% to 75% of the total production in the United States. This places them as the two dominant manufacturers in the industry. They conceded that the agreement of March 1, 1946 carried out most of the provisions of the 1939 agreement, the main change being that future patents instead of being classified "primary" and "secondary" are classified as Class A and Class B, the former being now defined as those which the "first contracting parties" decide to retain for their exclusive benefit and the second being those which they severally decided to assign to Development. It should be noted in this connection that there is also provision whereby Class A patents and applications may be converted into Class B. In this situation, the 1946 agreement is, in general, similar to the 1934 agreement with the exception that direct price fixing was eliminated and that there was a relaxation in the requirement that the validity of patents should be acknowledged, although when license forms were offered applicants such a provision was contained therein.

General and Radio are not in the position of the defendants in the case of Standard Oil Co. v. United States, supra, where the court declared patent pooling legal and used the following language: "Where there are legitimately conflicting claims or threatened interferences, a settlement by agreement, rather than litigation, is not precluded by the Act. * * * An interchange of patent rights and a division of royalties according to the value attributed by the parties to their respective patent claims is frequently necessary if technical advancement is not to be blocked by threatened litigation. If the available advantages are open on reasonable terms to all manufacturers desiring to participate, such interchange may promote rather than restrain competition." 283 U.S. at page 171, 51 S.Ct. at page 424. Rather are they within the contemplation of the Court in the same case when it said: "The rate of royalties may, of course, be a decisive factor in the cost of production. If combining patent owners effectively dominate an industry, the power to fix and maintain royalties is tantamount to the power to fix prices." 283 U.S. at page 174, 51 S.Ct. at page 425. This doctrine was reemphasized in the case of United States v. Line Material Co., 333 U.S. 287, 313–314, 68 S.Ct. 550, 92 L.Ed. 701.

The Development parties exceeded the boundaries of permitted cross licensing of the patents separately owned by them when they vested in their creature, Development, the power to grant licenses and to use those licenses for aggressive or defensive purposes. This power with but insignificant modifications is as inherent in the 1946 agreement as it was in the 1934 agreement. Although direct price fixing present in the Line Material case is absent here, an equivalent power is established in the dominant position of the parties and the royalty me-

chanism centered in the hands of Development. In this manner the normal patent monopoly with its products of legitimate cross-licensing and royalties, is extended to give multiple advantages to individual patent holders dominant in the industry by combining their patents and affording the mechanism to reap mutual rewards greater than their individual patents would justify.

Once it is established that the agreement per se is the device which has vested the combination with power to restrain trade, it is unnecessary to show that the actual restraints have been applied. Domination of the industry with power to restrain is sufficient to bring the combination within the scope of the anti-trust law. American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575.

"Combinations are no less unlawful because they have not as yet resulted in restraint. An agreement or combination to follow a course of conduct which will necessarily restrain or monopolize a part of trade or commerce may violate the Sherman Act, whether it be 'wholly nascent or abortive on the one hand, or successful on the other.'" Associated Press v. United States, 326 U.S. 1, 12, 65 S.Ct. 1416, 1421, 89 L.Ed. 2013.

Therefore, the 1946 agreement must be held to be in restraint of trade and an attempt to monopolize the variable condenser industry in the United States in violation of §§ 1 and 2 of the Sherman Act.

The position of Variable is that of a competitor of the Development parties who bowed to the exigencies of its situation and accepted the position of a licensee. During the period when it faced patent litigation by the Development parties it sought to escape its dilemma by attempting to purchase the Wilhelm patents. The conclusion must be that although the Wilhelm patents may have been of no material value to the Development parties in manufacturing variable condensers, their possession of them would weaken Variable by denying it a possible means of manufacturing without infringing Development patents. In spite of the protestations of the Development parties that their acquisition was based up-

on good motives, the natural effect was a factor in forcing Variable into their control and to compel it to accept a license with its restrictions.

However much Variable may have acted by compulsion, the case of U. S. v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701, controls, for it stands in no better position than the licensees in that case, wherein the Court said: "Licensees under the contract who as here enter into license arrangements, with price fixing provisions, with knowledge of the contract, are equally subject to the prohibitions." 333 U.S. at page 315, 68 S.Ct. at page 564. Price fixing provisions were, it is conceded, a factor in the above cited case, but their equivalents were present in the association of Variable in its agreement with the Development parties. This is made clear by its express assertion in its defense of the action brought against it in New York by Development's assignee for arrearages of royalties. Although that contest was amicably adjusted, when it burned at its heat Variable had no hesitation in forcefully claiming, in its defense against the demand for royalties, that it was being victimized by the activities of the Development parties which were as it, Variable, specifically alleged, in violation of the anti-trust laws. So Variable rebelled but probably finding it economic to succumb, it gave thereafter full cooperation to the Development parties. It must be held a member of the price fixing combination in existence prior to 1940 and although evidence is lacking of subsequent price fixing, it has continued to be a licensee with knowledge of the iniquities of its arrangement down to the time of this suit. Therefore, it is a conspirator with General and Radio and a violator of §§ 1 and 2 of the Sherman Act.

In addition to the corporate defendants, General, Radio, Development and Variable, the following individual defendants were active parties to the agreements and the activities in connection therewith and must be held to have likewise violated §§ 1 and 2 of the Sherman Act: Abraham Blumenkrantz, Samuel Cohen, Stanley S. Cramer, Russell E. Cramer and Charles

Hyman. Proof is lacking of any affirmative control exercised by the defendants Nathan and Edward Hyman (associated with Variable) that would make them parties to the conspiracy. Accordingly they are found not to have participated and the motion for summary judgment in their favor will be granted. The motion of the plaintiff for summary judgment in its favor against the other defendants above named will be granted. The motion for summary judgment upon the part of the defendants General, Radio, Development, Variable, Blumenkrantz, Cohen, Stanley S. and Russell E. Cramer and Charles Hyman will be denied.

An order in conformity with this opinion embodying the terms of relief to which the plaintiff is entitled should be submitted on notice to the parties.